[No. 75400-4. En Banc.]
Argued February 15, 2005. Decided June 30, 2005.

HEARST COMMUNICATIONS, INC., ET AL., *Petitioners*, v. SEATTLE TIMES COMPANY, *Respondent*.

494

*Dmitri L. Iglitzin* (of *Schwerin Campbell Barnard, L.L.P.*) and *Kelly P. Corr, Guy P. Michelson*, and *Kelsey L. Joyce* (of *Corr Cronin, L.L.P.*), for petitioners.

*Marvin L. Gray, Jr., Stephen M. Rummage*, and *Douglas C. Ross* (of *Davis Wright Tremaine, L.L.P.*), for respondent.

¶1 Chambers, J. — We are asked to interpret the Joint Operating Agreement between the two daily metropolitan newspapers serving the greater Seattle area. We are told that our decision could lead to the closing of one of these newspapers. The advantages of having two great newspapers in our state's largest city, each with an independent editorial and reportorial voice, are numerous and we do not address our task lightly. Our duty, however, is to interpret and apply the law.

¶2 The law of contracts is the same whether the parties are two publishing giants fighting for market control or two individuals disputing the cost of appliance repair work. In the dispute between Hearst Communications, Inc. (Hearst), which owns the *Seattle Post-Intelligencer* (*Seattle P-I*), and the Seattle Times Co. (Times), which owns *The Seattle Times* (*Seattle Times*), we are asked to interpret two clauses of their Joint Operating Agreement (JOA). We conclude that the written contract between the parties is subject to only one reasonable interpretation. Losses resulting from the 2000-2001 strike by the Newspaper Guild and the Teamsters Union are included in "agency expenses" and may properly be used to calculate "agency revenues" for application of the "loss operations" clause. We therefore agree with and affirm the well-reasoned opinion of the Court of Appeals.

## History of Joint Operating Agreements

¶3 This is the not uncommon story of the struggle of two newspapers in one town. In many cases, two newspapers have survived in one town by sharing expenses under what is called a JOA. As with any two-newspapers-in-one-town story, the history of JOAs is a good place to start. A JOA is a government-sanctioned contract that allows competing

newspaper companies to combine some operations and share profits while distributing separate newspapers.

¶4 Beginning during the Great Depression, some newspaper publishers negotiated agreements with local competitors to reduce production costs by combining operating expenses, while maintaining separate and independent reportorial and editorial operations. *See Comm. for an Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 473 (9th Cir. 1983). In *Citizen Publishing Co.*, the United States Supreme Court held that such arrangements constituted illegal price-fixing and conspiracy to monopolize in violation of the Sherman Act (15 U.S.C. §§ 1-7) and the Clayton Act (15 U.S.C. §§ 12-27). *Citizen Publ'g Co. v. United States,* 394 U.S. 131, 89 S. Ct. 927, 22 L. Ed. 2d 148 (1969). In response, Congress enacted the Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804.[1] The Newspaper Preservation Act creates a process by which parties to a JOA can gain limited antitrust immunity. *Id.* JOAs require the prior written approval of the Attorney General of the United States. 15 U.S.C. § 1803(b).

HISTORY OF THE TIMES-HEARST JOINT OPERATING AGREEMENT

¶5 Founded in the 1890s, the *Seattle Times* and the *Seattle P-I* have been the only metropolitan daily newspapers in Seattle for some time. *Comm. for an Indep. P-I*, 704 F.2d at 469-70. By the late 1960s, however, the *Seattle P-I* began losing ground to the *Seattle Times* in terms of circulation and advertising revenue. *Id.* In 1981, owners of the two papers entered into a JOA to share certain expenses and revenues. *Id.* at 469-70.

---

[1] The act provides, in relevant part, that:

[i]n the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city . . . where a joint operating arrangement has been heretofore entered into because of economic distress . . . .

15 U.S.C. § 1801.

¶6 In 1982, the United States Attorney General approved the JOA pursuant to the Newspaper Protection Act. *See Comm. for an Indep. P-I*, 704 F.2d at 471.[2] The attorney general's approval was predicated on a finding that one of the newspapers was a "failing newspaper." 15 U.S.C. § 1803(b). The attorney general found that the *Seattle P-I* was such a newspaper and approved the JOA, a decision that was upheld in federal court. *Comm. for an Indep. P-I*, 704 F.2d at 473-74.

¶7 Pursuant to the terms of the 1981 JOA, the Times was required to provide the newsprint, presses, and labor and to print, sell, and distribute both newspapers. The two newspapers were to maintain independent news and editorial departments, however, and remain separately owned and managed. The Times and Hearst shared the total operating revenues and expenses, minus news and editorial expenses, of both papers in a ratio of 66 percent to 34 percent respectively.

¶8 In 1999, the parties amended the JOA.[3] The amendments allowed the *Seattle Times* to move from an afternoon publication to a morning publication, and compete head to head against the morning *Seattle P-I*. *Compare* Clerk's Papers (CP) at 34 (1981 JOA § 4.1) *with* CP at 88 (1999 JOA § 3.1). In exchange for this concession on the part of Hearst, the Times agreed to change the revenue-sharing formula in Hearst's favor. *Compare* CP at 38-39 (1981 JOA § 5.1) *with* CP at 92 (1999 JOA § 4.1). Under the 1999 JOA, the Times

[2] As noted above, that approval was required in order to exempt the JOA from federal antitrust laws. The Newspaper Preservation Act describes what is required to avoid liability under the Sherman and Clayton Acts. *See Citizen Publ'g Co.*, 394 U.S. 131.

It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

15 U.S.C. § 1803(b).

[3] Unless otherwise noted, all future references to the JOA in this opinion refer to the 1999 agreement.

and Hearst share the combined revenues and expenses of the two newspapers, except for news and editorial expenses, in a 60-40 ratio respectively. Under this revenue-sharing plan, each newspaper receives its share of the remainder of the combined revenues minus expenses in that same ratio. That remainder is then used by each newspaper to pay its own news and editorial expenses. The fixed ratio applies regardless of whether the newspapers are generating revenue in the same 60-40 ratio. These revenues and expenses are respectively referred to as "agency revenues" and "agency expenses." The excess of agency revenues over agency expenses is referred to as the "agency remainder." This is the amount distributed to each newspaper, in the 60-40 ratio, for the purposes of paying the news and editorial expenses of each newspaper.

¶9 The JOA contains a "loss operation" clause.[4] That clause permits either party to terminate the agreement after three consecutive years of operation losses. The loss operation clause may be invoked when the agency remainder is insufficient to pay a party's own news and editorial expenses. A party invokes the loss operation clause by issuing a "loss notice," stating its intent to establish the "Newspaper Cessation Date . . . at the earliest possible opportunity." CP at 102. The parties must then cooperate to bring about the cessation date but, if unable to do so, the agreement automatically terminates 18 months after the loss notice.[5] The JOA also contains a "force majeure" clause, which provides that neither party shall be liable to the other for any failure of performance resulting from force majeure events, such as acts of war or labor strikes.

¶10 Between 1981 and 2000, the story of Seattle as a two-newspaper town was a seemingly happy one. Whether the ending will be as happy is yet to be seen. Beginning in

---

[4] The "loss operation" clause is also referred to as the "loss provision," the "loss clause," the "escape clause," and the "frustration of purpose clause." It is found in both the 1981 and 1999 agreements.

[5] Under the 1981 JOA, termination occurred automatically 36 months after the loss notice was issued.

November 2000, the Newspaper Guild and the Teamsters Union went on strike. The strike affected both papers, causing significant increases in expenses and decreases in revenues. As a result, the Times was unable to cover its news and editorial expenses in both 2000 and 2001. The Times was also unable to cover its expenses in 2002, though the loss in that year was not attributable to the strike.

## PROCEDURAL HISTORY

¶11 Hearst filed a lawsuit in 2003, alleging that the Times had breached its fiduciary duties under the JOA by unnecessarily incurring losses for the purpose of creating a third consecutive year of losses so that it could invoke the loss operations clause.[6] Additionally, Hearst sought a judgment declaring that the Times could not invoke the loss operations clause because its losses in the three preceding years were the result of force majeure events, including the strike, the September 11, 2001, terrorist attacks, and the ensuing economic recession of 2002. CP at 9-11. The following day, the Times issued the loss notice required under the loss operations clause. Following a discovery period, the parties filed cross motions for partial summary judgment on the question of whether the force majeure clause prevented the Times from issuing a loss notice given the Times' acknowledgement that, but for the strikes, it would not have incurred a loss in 2000. The Committee for a Two-Newspaper Town intervened on the side of Hearst, arguing that public policy supported construing the contract so as to prevent the termination of the JOA.

¶12 The Times and Hearst each submitted extrinsic evidence regarding the negotiation of the JOA and the parties' conduct under the agreement. This evidence included the overall purpose of the contract as evidenced by the language in the preamble and in the Newspaper Preservation Act. *See* CP at 83-84; 15 U.S.C. § 1801. Other

---

[6] *See* Compl. for Declaratory & Injunctive Relief, Breach of Contract, & Breach of Implied Covenants of Good Faith & Fair Dealing, CP at 11-13.

evidence was submitted to demonstrate the circumstances surrounding the formation of the contract, including letters from executives at the Times to Hearst indicating the Times' reasons for including the loss operations clause. Hearst submitted evidence of the Times' postformation conduct. Finally, Hearst presented the testimony of a Hearst executive who testified that the reason Hearst did not more vehemently object to the inclusion of the loss operations clause is that Hearst believed it was already protected under that clause for losses caused by force majeure events.

¶13 The trial court granted summary judgment in favor of Hearst, ruling that the force majeure clause precluded the Times' issuance of a loss notice based on strike losses. The trial court relied almost exclusively upon extrinsic evidence to support its conclusion.[7] The Court of Appeals reversed and ordered an entry of summary judgment in favor of the Times. *Hearst Communications, Inc. v. Seattle Times Co.*, 120 Wn. App. 784, 86 P.3d 1194 (2004). We granted review on the question of whether the force majeure clause limits the Times' ability to issue a loss notice under the loss operations clause.[8] *Hearst Communications, Inc. v. Seattle Times Co.*, 152 Wn.2d 1028, 103 P.3d 200 (2004). We also take this opportunity to further clarify our opinion in *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990). Other issues including whether Hearst suffered a loss in 2002 are not before us.

---

[7] In its oral ruling, the trial court did not discuss the language of the clauses at issue at all. Tr. of Oral Decision (Sept. 25, 2003). The trial court referenced only the preamble of the JOA and did so only to point out that the overall purpose of the JOA was to ensure the continued publication of both newspapers. *Id.* at 4. While continued publication of both papers was clearly the purpose of the JOA, it is equally as clear that the parties envisioned circumstances under which joint publication should cease.

[8] Citing RAP 9.12, Hearst moves to strike statements in the Times' supplemental brief. Although the allegedly improper statements have no relevance to the issues necessary to resolve this case, we deny the motion to strike them.

ANALYSIS

¶14 Our review is de novo. *See, e.g., Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000). Summary judgment is appropriate only where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c); *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).

¶15 At the heart of this dispute is the meaning of and relationship between the loss operations clause and the force majeure clause. The Times contends that it experienced three consecutive years of losses and is entitled to activate the loss operations clause by giving a loss notice. Hearst asserts that issuance of such a notice is precluded by the force majeure clause. The force majeure clause provides a complete defense to liability if one party is unable to perform its obligations under the contract because of circumstances outside its control, such as a labor strike. Hearst argues that since the labor strike in 2000 and 2001 was a force majeure event, it cannot be used as a basis of terminating the contract. Hearst posits that the loss operations clause was included based on the understanding that the clause would be invoked only if future changes in the market made the Seattle marketplace unable to support two newspapers. Both parties offered extrinsic evidence to support their respective interpretations of the contract. The record below indicates that the trial court based its reliance on extrinsic evidence on our decision in *Berg*, 115 Wn.2d 657, and its progeny.

¶16 In *Berg*, we dealt with a ground lease and the meaning of the term "gross rentals." The tenant in that case developed the property and sublet the building to a Safeway store. After the Safeway had vacated, the tenant converted the building into a small shopping center and rented space to many subtenants. The ground lease required the tenant to pay a portion of "gross rentals" to the landlord. However, the tenant received "reimbursements" from subtenants and

the issue was whether "reimbursements" were "gross rentals" under the ground lease. The term "gross rentals" was not defined in the lease.

¶17 In *Berg*, we recognized the difficulties associated with interpreting contracts solely on the basis of the "plain meaning" of the words in the document. We said that the process of interpretation involves " 'one person giving a meaning to the symbols of expression used by another person.' " *Berg*, 115 Wn.2d at 663 (quoting 3 ARTHUR LINTON CORBIN, CONTRACTS § 532, at 2 (1960)).[9] We recognized that the meaning of a writing " 'can almost never be plain except in a context.' " *Id.* at 668 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 212 cmt. b (1981)). We adopted the "context rule" and recognized that intent of the contracting parties cannot be interpreted without examining the context surrounding an instrument's execution. If relevant for determining mutual intent, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties. *Id.* at 667 (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973)). In *Berg*, we concluded that extrinsic evidence was admissible to aid in understanding the parties' intent with respect to the meaning of "gross rentals." *Id.* at 672.

¶18 Unfortunately, there has been much confusion over the implications of *Berg*.

---

[9] Although we have often used the terms interchangeably, we have recognized that there is a difference between interpretation and construction of contracts. *Berg*, 115 Wn.2d 657. Interpretation of a contract is the process by which we ascertain the meaning we will give to the language of the document by examining objective manifestations of the parties' intent. *Id.* at 663 (quoting Arthur L. Corbin, *The Interpretation of Words and the Parol Evidence Rule*, 50 CORNELL L.Q. 161, 162 (1965)). Construction of a contract, on the other hand, is the process by which we apply relevant legal principles to the circumstances of a case in order to determine the legal consequences of the words. *Id.* (quoting Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 COLUM. L. REV. 833, 835 (1964)).

¶19 In *Hollis*, we sought to clarify the meaning of *Berg*:

Initially *Berg* was viewed by some as authorizing unrestricted use of extrinsic evidence in contract analysis, thus creating unpredictability in contract interpretation. During the past eight years, the rule announced in *Berg* has been explained and refined by this court, resulting in a more consistent, predictable approach to contract interpretation in this state.

*Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 693, 974 P.2d 836 (1999) (citations omitted). Since *Berg*, we have explained that surrounding circumstances and other extrinsic evidence are to be used "to determine the meaning of *specific words and terms used*" and not to "show an intention independent of the instrument" or to "vary, contradict or modify the written word." *Id.* at 695-96 (emphasis added). *See also U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 571, 919 P.2d 594 (1996) (court's intention in adopting the "context rule" was not "to allow such evidence to be employed to emasculate the written expression of" the meaning of the contract's terms); *In re Marriage of Schweitzer*, 132 Wn.2d 318, 327, 937 P.2d 1062 (1997) ("context rule" cannot be used to show intention independent of the instrument); *Go2Net, Inc. v. CI Host, Inc.*, 115 Wn. App. 73, 60 P.3d 1245 (2003) (admissible extrinsic evidence does *not* include evidence of a party's unilateral or subjective intent as to contract's meaning).

¶20 Our holding in *Berg* may have been misunderstood as it implicates the admission of parol and extrinsic evidence. We take this opportunity to acknowledge that Washington continues to follow the objective manifestation theory of contracts. Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. *Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co. of Seattle*, 62 Wn. App. 593, 602, 815 P.2d 284 (1991). We impute an intention corresponding to the reasonable meaning of the words used. *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994). Thus, when interpreting

contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used. *City of Everett v. Estate of Sumstad*, 95 Wn.2d 853, 855, 631 P.2d 366 (1981). We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 637, 745 P.2d 53 (1987). We do not interpret what was intended to be written but what was written. *J.W. Seavey Hop Corp. of Portland v. Pollock,* 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944), *cited with approval in Berg*, 115 Wn.2d at 669.

## THE JOINT OPERATING AGREEMENT

¶21 We next apply the rules of contract interpretation and construction to the instrument at issue in this case. Hearst claims that the language of the force majeure clause limits the Times' ability to invoke the provisions of the loss operations clause. The Times counters that the clauses are to be read independently of one another and that in the absence of any liability being imposed on Hearst, the force majeure clause remains inapplicable. Both Hearst and the Times offered extrinsic evidence at trial in an attempt to shed light on the meaning of the JOA and its terms.

## THE LOSS OPERATIONS CLAUSE

¶22 The loss operations clause provides for termination of the agreement if either party suffers three years of losses.[10] By its terms, the clause may be triggered if, for three consecutive years, either party does not receive a

---

[10] The loss operations clause states, in relevant part:

[I]f at any time hereafter there are any three (3) consecutive years in which either of the parties does not receive a distribution of Agency Remainder ... adequate to pay the expenses of its news and editorial operations for each of such years, ... such party may ... give the other party notice [the "loss notice"] of such party's election to establish the Newspaper Cessation Date ... at the earliest possible opportunity. ... The date upon which such notice shall be given shall be the "loss Notice Date." Immediately upon the occurrence of the Loss Notice Date, both parties shall cooperate to effect, and

distribution of agency remainder that is adequate to pay the expenses of its news and editorial operations for each of such years. Agency remainder is defined in the JOA as the excess of agency revenues over agency expenses. Agency revenues are further defined as "revenues from circulation . . . and from advertising," plus certain incidental matters, but excluding income from sources not directly related to printing and publishing the newspaper. CP at 114.

¶23 The real core of the controversy here is whether agency expenses, as used in the JOA, include losses occasioned by the 2000-2001 Newspaper Guild and Teamsters Union labor strike. Unlike the term "gross rentals" in *Berg*, the term "agency expenses" is defined in the JOA. In fact, the definition of agency expenses is five pages long.[11] Agency expenses are defined as *all* expenses associated with the Times' obligation to produce, promote, and distribute the newspapers and their contents, including 22 identified categories of expenses. News and editorial expenses are defined in Appendix C of the JOA and include 15 identified categories of expenses.[12] The definition of "agency expenses" includes "[c]ompensation, including, but

use their best efforts to bring about, the Newspaper Cessation Date at the earliest possible time. Time shall be of the essence of this provision, and each party hereby agrees and commits that as expeditiously as possible such party will take all action within its control that may be necessary or desirable to cause the parties to be in a position to affect the cessation of publication by the Agency of one of the Newspapers. In the event that the parties shall not have caused the Newspaper Cessation Date to occur within eighteen (18) months of the Loss Notice Date, this Agreement shall thereupon terminate immediately.

CP at 102-03.

[11] The definition is spelled out in Appendix B of the agreement. *See* attached Appendix.

[12] These categories include "the cost and expense of the news and editorial departments of the respective newspapers." CP at 124. These costs include compensation for news and editorial employees; severance pay for those employees; traveling expenses of those employees; dues for professional associations; charges for news and wire services; charges for the right to publish news and editorial features; the cost of news and editorial mats and engravings; news and editorial promotion expenses; telephone and long distance charges of the news and editorial departments; charges for rental, repair, and maintenance of equipment used by the news and editorial departments; cost of messenger services used by those departments; insurance costs covering the news and editorial departments;

without limitation, retirement, health, death and other fringe benefits, workers' compensation coverage and group insurance of Times' non-news and non-editorial employees." CP at 118.

¶24 Under the JOA, the Times' independent accountants must do an annual audit of the amount of agency revenues, agency expenses, and agency remainder and certify those results to Hearst as having been prepared in accordance with "generally accepted accounting principles." CP at 94. In order to give a loss notice, the opinion of a national firm of independent certified public accountants must be included, certifying that the news and editorial expenses are fairly presented in accordance with generally accepted accounting principles. Hearst has the right to audit the agency remainder and, when a loss notice is issued, may audit the news and editorial expenses as well.

¶25 Losses are to be determined by consulting the detailed schedule laid out in the JOA and its appendices. The definitions adopted by the parties do not list or exclude from calculations expenses attributable to strikes or other force majeure events. Thus, there is nothing in the definition of agency expenses or the loss operations clause that purports to deal with alternative means of calculating losses, e.g., losses caused by a strike as opposed to losses caused by a marketplace unable to sustain two newspapers.

THE FORCE MAJEURE CLAUSE

¶26 Hearst argues that the force majeure clause by its terms modifies the loss operations clause so as to prevent losses associated with labor strikes. Hearst claims that such losses are not agency expenses for the purpose of calculating agency revenues and, therefore, cannot be used to calculate operational losses.

¶27 Contrary to Hearst's assertions, nothing in the force majeure clause itself modifies the method of calculating

---

legal and professional services of the news and editorial departments; and the cost of operating a library for news and editorial operations.

agency revenues. The force majeure clause merely provides a defense to *liability* when a party is *required to perform*, fails to do so, and that failure is *caused by a strike* or other event within its scope.

¶28 The force majeure clause states:

Neither party shall be *liable* to the other for any *failure or delay in performance* under this Agreement, *occasioned by* war, riot, government action, act of God or public enemy, damage to or destruction of facilities, *strike*, labor dispute, failure of supplier or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform.

CP at 49, 100 (emphasis added).

¶29 Under the JOA, the Times is obligated to provide newsprint, presses, and labor and to print, sell, and distribute the newspapers for both parties. If the Times failed to print and distribute the newspapers because of a labor strike or other force beyond its control, it would be in breach of its agreement and arguably liable to Hearst. The record below reflects that the force majeure clause was included at the insistence of the Times. Since the Times is responsible for the printing and distribution process and would have potential liability to Hearst if it failed to perform these duties because of an event beyond its control, its insistence on a force majeure clause is understandable.

¶30 We note that the force majeure clause does not reference the loss operations clause, nor does the loss operations clause reference the force majeure clause. Further, there is nothing elsewhere in the text of the JOA that explains if or how they affect each other. So long as delay or failure to perform is caused by a force majeure event, the force majeure clause excuses *liability* occasioned by such an event.

¶31 The Times suggests that nothing associated with giving a loss notice requires any performance by Hearst that would create liability. The Times argues that without liability, there is nothing to trigger the defense of force

majeure. Hearst counters that it does face liability as the loss operations clause imposes upon Hearst an obligation to cooperate to bring about a cessation date. Hearst argues that this obligation is occasioned by the strike because the Times' ability to issue a loss notice was, at least partially, occasioned by the strike. Thus, Hearst suggests that its obligation to negotiate a cessation date, a duty it is required to perform, is relieved because of the force majeure clause.

¶32 We agree with the Court of Appeals. Hearst's suggestion that it incurs liability because of its duty to negotiate a cessation date is not a reasonable reading of the term liability as it is used in the agreement. Even assuming that Hearst has an obligation to cooperate in setting a loss notice date, Hearst may decline to perform its obligation without incurring liability to the Times. By the plain terms of the loss operations clause, if the parties do not agree upon a cessation date, the JOA terminates automatically 18 months after the loss notice. The agreement expressly anticipates the possibility that the parties will be unable (for whatever reason) to agree upon a cessation date and provides an automatic remedy. Thus the failure to cooperate in setting the cessation date creates no liability; once set in motion, cessation of the agreement is automatic 18 months later.

¶33 Also important to our analysis is that the Times is not seeking to hold Hearst liable for failure to negotiate a cessation date. If the Times were contending that Hearst was liable for failing to cooperate in setting a cessation date, our analysis might differ, but the end result would still be the same. Hearst's failure to negotiate does not cause it to incur any liability to the Times.

¶34 Next, Hearst argues the parties intended that the JOA agreement would terminate only if and when the Seattle marketplace is unable to support two newspapers. Hearst points to the parties' declaration in the JOA that it was "the firm belief . . . that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent under a joint news-

paper operating agreement, is of paramount importance to the citizens of Seattle and its environs." CP at 84. About this there is no dispute. According to Hearst, it follows that the loss operations clause can be invoked only upon a showing that the Seattle economy has so deteriorated that it is no longer feasible to operate more than one newspaper. But again, nowhere in the text of the JOA is there language supporting this theory. Neither the words in the loss operations clause nor in the definition of agency expenses suggest a dependence upon a decline in the marketplace as a necessary prerequisite to the issuance of a loss notice.

¶35 Because extrinsic evidence may be used only to determine the meaning of specific words in the agreement, extrinsic evidence about the parties desire to ensure that the Seattle area maintained two newspapers of general circulation is irrelevant. *See Hollis*, 137 Wn.2d at 695-96. Furthermore, it is unreasonable to suggest that the absence of any negotiation about the applicability of one clause to another, especially where the clauses do not reference each other, leads to the conclusion that they were intended to apply to each other.

¶36 We find no support for Hearst's contention that the shrinking marketplace limitation on the loss operations clause found expression in the force majeure clause. Market forces are by their very nature beyond the control of the parties. Hearst's complaint identifies several alleged causes of the economic losses suffered by the Times, including the strike and the September 11, 2001, terrorists attacks, as well as the resulting recession, the labor unrest of Seattle dockworkers, the Boeing Company's layoff of 30,000 workers, the burst of the "dot.com" bubble, and the stock market decline of 2002.[13] These were all, of course, force majeure events in that they were extraordinary events beyond the control of the parties. They are also forces affecting the market and, potentially, the ability of competing newspapers to survive in the same marketplace.

---

[13] *See* Compl. for Declaratory & Injunctive Relief, Breach of Contract, & Breach of Implied Covenants of Good Faith & Fair Dealing, CP at 11-13.

¶37 It cannot now be seriously argued that the loss operations clause is inconsistent with the intention that the JOA should endure absent a significant and long term shift in the economic market conditions. In context, by agreeing to the loss operations clause, the parties objectively expressed an intention that both sought to avoid ongoing financial losses under the JOA. They mutually agreed to terminate the JOA if losses occurred for three consecutive years. The loss operations clause does not permit a termination of the JOA unless one of the parties experiences three consecutive years of losses as defined in the agreement; an additional 18 months of operation is contemplated under the JOA before termination of the agreement. Thus, the parties committed to continue to publish two newspapers for up to four and one-half years even in the face of economic losses. If the parties intended the JOA could be terminated *only* upon a showing that the marketplace would no longer support two newspapers—a matter much debated here—they failed to express that intent within the agreement they wrote.

¶38 We agree with the Court of Appeals that the JOA is subject to only one reasonable interpretation. Even if the parties intended to require that agency remainder be calculated differently when strike losses affect agency expenses, they failed to reduce such an intention to writing. Instead, they defined the specific elements of calculating gains and losses once, in lengthy detail, and embedded these terms without qualification in the loss operations clause. Hearst essentially asks us to rewrite the JOA by revising the loss operations clause, something we are not at liberty to do.[14]

---

[14] Hearst relies on extrinsic evidence in the form of the subsequent acts and conduct of the Times. Hearst cites three examples that it argues evidence the Times' understanding that the force majeure clause applies to the loss operations clause: (1) the Times' statement to its bankers that the financial impact of the strike was an extraordinary one-time occurrence, (2) the Times' suggestion that it was not obligated to print and circulate the *P-I* during the strike if doing so became impossible or impracticable, and (3) Times internal memoranda indicating that its exceeding of the charitable contributions cap under the JOA did not cause the Times to incur liability to Hearst because the excesses resulted from the

PUBLIC POLICY

¶39 The intervenor-Committee for a Two-Newspaper Town (the Committee) argues that the JOA should be construed so as to give effect to an interpretation that favors the public interest. The Committee points to the policy underlying the Newspaper Preservation Act, *see* 15 U.S.C. § 1801, and to the parties' own expressed intention that the purpose of the JOA was to preserve two independent reportorial and editorial voices. *See* CP at 83-84.

■ ¶40 The existence of the policy in question is not debatable. There is a clear national policy that supports maintenance of two newspapers as long as one of the newspapers is "failing" at the time that the attorney general approves of the joint agreement. 15 U.S.C. § 1803(b). The Committee does not suggest, however, that such a policy requires the court to ignore, modify, or contradict the express terms of the agreement. There is ample case law making it clear that generalized public policy concerns cannot be used to rewrite a clear and lawful contract. *See, e.g., Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 380, 917 P.2d 116 (1996) (courts "will not, under the guise of public policy, rewrite a clear contract"); *Fluke Corp. v. Hartford Acc. & Indem. Co.*, 102 Wn. App. 237, 246, 7 P.3d 825 (2000) ("Washington courts are reluctant to invoke public policy as a reason to limit or avoid express contract terms."). Because only the Times' interpretation of the JOA is reasonable, the strong public policy favoring the maintenance of diverse reportorial and editorial voices in the same community cannot be a basis to rewrite the contract.[15]

---

strike. None of this evidence, however, sheds any light on the meaning of the *words themselves*, nor does it suggest that the Times had an understanding of the words that reflected the interpretation of those words urged by Hearst. As such, the evidence of the Times' subsequent conduct is not relevant to our consideration of the meaning of the JOA.

[15] The Committee's arguments also require us to assume that the termination of the JOA will necessarily lead to the demise of the *P-I*. Whether Hearst would decide to close the *P-I* is beyond our ability either to predict or prevent.

CONCLUSION

¶41 We recognize this day is not a happy day in the ongoing story of Seattle as a two-newspaper town. We genuinely hope that both the *Seattle Times* and the *Seattle P-I* will continue to serve our communities and prosper. While a happy ending to the story of Seattle as a two-newspaper town is very desirable, our duty is clear. That duty is to uphold the law and to enforce lawful agreements parties bring before us. We conclude that the Joint Operating Agreement between Hearst and the Times is subject to only one reasonable interpretation. Extrinsic evidence offered by the parties is not relevant to our inquiry. By the plain terms of the agreement, labor costs, including those occasioned by strikes, are "agency expenses" under the terms of the contract. The Times may use those "agency expenses" to calculate "agency revenues" for application of the loss operations clause, which permits either party the right to terminate the agreement after three consecutive years of losses. We affirm the Court of Appeals and remand to the trial court for proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, SANDERS, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

MADSEN, J. concurs in the result only.

APPENDIX

¶42 The following comes from Appendix B of the 1999 JOA. CP at 118-23.

AGENCY EXPENSE

B.1 *Agency Expense - Elements.* The term "Agency Expense" as used in this Agreement shall mean and include all expenses of carrying out Times' obligations under this Agreement and in producing, promoting and distributing the Newspapers and their contents.

"Agency Expense" shall include, but without limitations:

B.1.1 Costs and expenses incurred by Times in printing, selling and distributing the Newspapers, in soliciting and

selling advertising space in the Newspapers, in collecting the circulation and advertising accounts receivable of the Newspapers, and in write-offs of receivables or providing a reasonable allowance for doubtful receivables;

B.1.2 Compensation, including, but without limitations, retirement, health, death and other fringe benefits, workers' compensation coverage and group insurance of Times' non-news and non-editorial employees;

B.1.3 Severance pay of Times' non-news and non-editorial employees;

B.1.4 Non-news and non-editorial executive, administrative and promotional expenses; provided, that salary of Times' personnel and related expenditures shall be includable as long as such person's duties are primarily devoted to Agency matters;

B.1.5 Costs and expenses incurred by Times in keeping records necessary and incidental to said operations, and in preparing and rendering statements as required under the terms of this Agreement;

B.1.6 A monthly charge for rental value of all Times' real property except that devoted to non-Agency activities such as Times news and editorial operations. The charge shall be based on the historical cost of such property and improvements and of further additions and improvements thereto (after having given effect to deductions for depreciation or amortization taken by the Times for financial statement purposes and after having deducted the amount of investment tax credit actually used by Times in its federal income tax returns in regard to such real property and improvements). The monthly charge shall be computed on the first day of each month and shall be one-twelfth (1/12) of a rate equal to the prime rate for the best commercial customers of Seattle-First National Bank in effect on the last day of the previous month, applied to the net book value as of such last day (after having given effect to deductions for depreciation or amortization taken by the Times for financial statement purposes and after having deducted the amount of investment tax credit actually used by Times in its federal income tax returns in regard to such real property and improvements) of such real property.

B.1.7 A monthly charge for the working capital of Times, computed as follows: The monthly charge shall be computed on

the first day of each month and shall be one-twelfth (1/12) of a rate equal to the prime rate for the best commercial customers of Seattle-First National Bank in effect on the last day of the previous month, applied to Times' net working capital as of such last day, determined in accordance with generally accepted accounting principles.

B.1.8 A monthly charge for a return on investment in machinery, equipment and other personal property (excluding inventory and any other personal property included in working capital as defined in Section B.1.7) provided by Times and used in Agency operations. The monthly charge shall be computed on the first day of each month and shall be one-twelfth (1/12) of a rate equal to the prime rate for the best commercial customers of Seattle-First National Bank in effect on the last day of the previous month, applied to the net book value as of such last day (after having given effect to deductions for depreciation or amortization taken by the Times for financial statement purposes and after having deducted the amount of investment tax credit actually used by Times in its federal income tax returns in regard to such machinery, equipment and personal property) of such machinery, equipment and other property (excluding any items used in news and editorial operations such as typewriters, video terminals and news editing systems).

B.1.9 A monthly charge for depreciation. Depreciation shall be computed on a straight-line basis based on the historical cost of machinery, equipment and other depreciable personal property of Times used in non-news and non-editorial agency operations hereunder.

The cost of all additions to machinery, equipment and other depreciable personal property used in Agency operations after the Effective Date shall be depreciated on a straight-line basis over the estimated useful life of such equipment as determined by the Times, and such depreciation shall be charged monthly to the Agency.

B.1.10 All sales and use taxes on equipment and personal property purchased for use by Times in or otherwise applied to newspaper operations under this Agreement to the extent that such taxes are not capitalized for purposes of depreciation or amortization;

B.1.11 All taxes or license fees paid by Times with respect to or resulting from the conduct of business under this Agreement or with respect to property used by Times in the operations under this Agreement, except Federal taxes, and state and local taxes if any, measured by net income;

B.1.12 Charitable or business contributions by Times, deductible for federal income tax purposes, to charitable organizations or business promotional organizations. Charitable contributions hereunder (excluding contributions in kind to charitable organizations) shall not exceed a maximum of 2% of projected Agency operating profit after deducting projected news and editorial costs of Times and an amount equal to such Times costs multiplied by the ratio of the number of P-I news and editorial employees to Times news and editorial employees as of January 1 of the year in question, which number shall be supplied by Hearst to Times. On all such charitable contributions, appropriate credit shall be given to both parties. Times may make charitable contributions beyond the 2% limitations which will not be considered Agency Expense.

B.1.13 The cost of initiation fees and periodic dues for Times non-news and non-editorial executives in business related social clubs such as the Rainier Club and the Washington Athletic Club; the cost of two memberships (i.e., initiation fees and periodic dues) in business related social clubs such as the Rainier Club and the Washington Athletic Club for P-I non-news and non-editorial executives; provided that Hearst may designate the same executive to hold both such memberships.

B.1.14 The cost of membership for Times in the Better Business Bureau, Seattle Chamber of Commerce, and other business-oriented memberships which shall be determined by Times to be in the best interests of the Agency;

B.1.15 The cost of Times and P-I membership in the Bureau of Advertising, Allied Daily Newspapers and American Newspaper Publishers Association; provided, that in regard to Bureau of Advertising membership, the P-I can be designated as a member thereof without any increase in dues which otherwise would be payable for Times membership alone; in the event that an amount of additional dues shall be required for such P-I membership, Hearst shall pay such additional dues if it shall elect to effect or maintain such membership.

B.1.16 The cost of public liability insurance and insurance against interruption or suspension of publication of the Newspapers, and the cost of libel, privacy and related insurance covering advertising printed in the Newspapers. Insurance costs relating to the news or editorial activities of the Seattle Times or the P-I shall not be considered Agency Expenses and such costs shall be borne separately by the parties; provided, that each party shall attempt to add the other as an additional named insured under such insurance, but Times may procure libel, privacy and related insurance to cover any otherwise inadequately insured exposure it may have as republisher of P-I news, editorial or advertising copy, and the cost of such additional insurance shall be Agency Expense;

B.1.17 Costs and expenses incurred by Times in obtaining legal and other professional services which it deems necessary in performing its obligations under the Agreement, including but not limited to the costs and fees related to any defense against third party claims, charges, complaints and related matters asserted against the Times related to the Agreement or such performance; provided, that such costs and fees related to news and editorial liabilities as defined in Section 6.1 shall not be Agency Expense, except insofar as such liabilities are asserted against Times solely due to its republication of P-I news, editorial or feature material;

B.1.18 Settlements, liabilities and other costs related to the matters described in Section B.1.17, above, except as limited in Section 6.1;

B.1.19 Any cost sharing agreed by the parties to be assignable to Agency Expense under Section 1.1;

B.1.20 Promotional expenses for circulation, advertising and company promotion (excluding news and editorial promotion expenses) as defined in Section 3.1;

B.1.21 The cost of advertising supplements, defined as purchased supplements which include both news and advertising content over which neither newspaper has control of news content; and

B.1.22 Interest on loans for the purpose of carrying on Times' non-news and non-editorial operations under the Agreement, to the extent interest on such loans exceeds the then prime rate as specified in Section B.1.8.

B.1.23 Effective on the Newspaper Cessation Date, should such date ever occur (and only on and after such date), any limitations of expenses to non-news and non-editorial expenses as outlined in paragraphs B.1.1 through B.1.22 of this Appendix B or in the body of the Agreement itself shall terminate, and all expenses incurred by the Continuing Newspaper for news and editorial purposes, including those expenses meeting the guidelines set forth in Appendix C to the Agreement, shall be included in Agency Expense thereafter.