IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES W. CHERBERG AND NAN CHOT CHERBERG, | ) ) ) | No. 75276-6-I |
| Respondents, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| HAL E. GRIFFITH and JOAN I. GRIFFITH, husband and wife, | ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) ) | FILED: November 20, 2017 |

MANN, J. — Nan and James Cherberg sued Hal and Joan Griffith, their next-door neighbors, seeking specific performance of the Griffiths' promise to execute a joint use agreement that would allow the Cherbergs to build a dock within 35 feet of the Griffiths' existing dock. The trial court granted summary judgment and ordered specific performance in favor of the Cherbergs. The Griffiths appeal. Because we find a genuine dispute of material fact as to what the parties intended in the purchase and sale agreement, we reverse and remand for trial.

FACTS

The Griffiths have lived on Mercer Island's northern shore since 1996. In February 2012, the Griffiths purchased the next-door property from their neighbor

Sandra Dunn. Prior to purchasing the Dunn property, the Griffiths and Dunns shared the use of a dock that straddled their common property boundary under a joint dock agreement. After buying the former Dunn property, the Griffiths burdened the property with two exclusive-use easements that benefitted the Griffiths' property: an easement securing the use of the existing dock and an easement securing the exclusive use of a small promontory between the two properties.

After the easements were recorded, the Griffiths listed the property for sale through real estate agent Kris Robb. The listing specifically stated that it was a "no dock property." Robb was contacted by former clients, Nan and James Cherberg, who expressed interest in buying the property. The Cherbergs asked Robb to serve as a duel agent. Robb informed the Cherbergs of the two exclusive-use easements. The Cherbergs responded that they wanted to build a small dock and would need the Griffiths' cooperation. Robb relayed to the Griffiths the Cherbergs' interest in building a small dock. The Griffiths indicated that they would have no objection to a modest dock as long as it did not interfere with the use of their own dock.

On June 5, 2012, the Cherbergs submitted an offer through a purchase and sale agreement. The next day the Griffiths accepted the offer by countersigning the purchase and sale agreement, putting the property under contract pending inspection. The signed purchase and sale agreement included an addendum providing in part:

> Sellers hereby agree to assist Buyers in their effort to obtain a dock permit. They agree not to challenge in any way the Buyers solicitation of said permit.

Sellers hereby agree to allow Buyers to encroach into the normal 35 foot setback between ~~docks to no closer than 25 feet~~.[1] This may entail changing the easement which is in place regarding the landscape on the Western most property along the waterfront. Sellers agree to cooperate with Buyers in order to obtain a permit for a dock along the Western line of the property.

On June 6, the same day the parties executed the purchase and sale agreement, the Cherbergs' dock contractor, Ted Burns, e-mailed the Cherbergs to inform them that they would need to enter into a joint use agreement with the Griffiths in order to build a dock:

[T]he Joint Use Agreement with the [Griffiths] should allow us to be within 20' of their existing dock, and it would be even better if we could be within 15'. In addition, it should address either the removal of the [existing floating dock] or the ability to locate within 5' of the floats.

Burns's e-mail included a sketch of the proposed dock, a plot showing the lot lines, and a blank form joint use agreement from the City of Mercer Island.

On June 13, 2012, the Cherbergs sent the Griffiths a new proposed addendum. This second addendum was accompanied by the June 6 e-mail from Burns to Cherberg, including the plot showing the property lines, the sketch of the proposed dock, and the blank form joint use agreement. The copy of Burns's e-mail that the Griffiths received was annotated by Robbs with the words, "This is a general proposal but is not binding but nothing will happen but to code."

On June 23, 2012, the parties agreed to, and finalized the second addendum, which provided in part:

Seller acknowledges receipt of the NEW DOCK email copy from Ted Burns outlining the proposed dock Buyer intends to pursue. Seller further

---

[1] The Griffiths struck this language before signing.

acknowledges the receipt of a copy of the lateral lines plot from King County Records and the proposed Dock sketch.
~~Seller agrees to remove the floating dock at such time as the Buyer asks for it to be removed but not prior to that time and cooperate with Buyer and the piling company to pursue a permit in order to obtain the dock.~~[2]
Seller further agrees to sign a Joint Use Agreement as attached which will allow the Buyer to place the proposed dock within the 35 foot setback usually required.

The day after the second addendum was executed, James Cherberg sent Robbs an e-mail reflecting his uncertainty about the dock:

> I was operating under impression they were going to remove the floating dock and move it elsewhere, and not just reconfigure it and leave in same place. I have some notes from a conversation you and I had about Mr. and Mrs. Griffith "have no problem" to "take away floating dock." A couple of sub-issues here:
>
> a. The most important one to me is the encroachment Hal has agreed to. Leaving the floating dock in place might make the permitting more difficult. . . .
>
> b. If floating dock stays, how close will he allow us to encroach? Does the Corps have any say in this? Are the Griffiths willing to move it if necessary?

The purchase and sale agreement closed on June 30, 2012. The parties did not execute a joint use agreement at closing.

Over the next six months, the Cherbergs and Griffiths continued to discuss the size and location of the Cherbergs' proposed dock without reaching agreement. On January 11, 2013, the Cherbergs' attorney, Charlie Klinge, e-mailed the Griffiths' attorney, Shannon Sperry, with an update:

> Dock: The dock issues are complex which is typical due to the multiple agencies and regulations involved, and of course the narrow site is challenging. I talked to Jim [Cherberg] about getting a final dock layout that Griffith can review and then make comments on and/or approve. Jim

---

[2] The Griffiths struck this language before signing.

-4-

No. 75276-6-I/5

has been going through various options with the dock designer to balance all the issues: personal desires, neighbors, and agencies. It seemed to me that Jim needed to come to conclusions and then present that to the Griffiths. So, that will take a bit more time.

I think we should let Jim focus on finalizing a dock plan. Once Cherberg and Griffith are agreed on the dock location, then we can look at the Joint Use Agreement, etc.

On January 21, James Cherberg wrote to the Griffiths to update them about the status of the dock's design:

I have asked [the dock builder] Seaborn to provide a detailed scaled drawing of this location and access to the dock and its acceptability to you. In this location it would still be necessary, however, to meet Mercer Island's Joint Agreement Use (on both sides of the dock). I have Cc'cd this e-mail to my attorney to keep him in the loop, as you have requested Shannon Sperry review M.I's Agreement with him after we've agreed on the dock location and access.

That same day in an e-mail to Burns, Cherberg acknowledged that the Griffiths' consent was necessary before he moved forward on a dock design:

Per our discussion Fri., I'd like a detailed drawing provided by [the surveyor] M.W. Marshall of the proposed dock location, access, and configuration. But before we do, I think we should meet again and I'd be most comfortable in having him present—perhaps even on site, if not at your office—so we can all be very specific and get this drawing done. I will need to get Hal Griffith's verbal agreement as to location before having Marshall begin his drawing.

In April 2013, the Cherbergs applied for a permit with the U.S. Army Corps of Engineers (Corps) to build a dock, install two ground-based boatlifts, and plant native shoreline vegetation.[3] The proposed dock drawing submitted to the Corps was similar to the sketch provided to the Griffiths with the second addendum, but was larger and approximately 5 feet closer to the Griffiths' dock.

---

[3] Proposals to construct new docks are subject to review by the Corps as well as the City of Mercer Island. The Corps reviews proposed docks for, among other factors, their impact on navigability and feasibility of vessels to approach and tie up to existing docks.

-5-

In January 2014, the Corps questioned the size and proximity of the proposed dock to the Griffiths' dock and resulting interference with the Griffiths' use of their dock:

> It appears that the Griffiths['] pier north of the project is on the Cherberg property, as you stated. It seems that 18.5 feet would be insufficient room for the Griffith family to use their pier, especially since a large pier like that could accommodate a larger vessel.

On January 29, Burns replied that "[t]he Proposed pier location was discussed with the Griffiths as part of purchasing the property and they agree with the location."

In February 2014, the Corps informed Burns that it had sent the proposal out for agency and tribal comment and that there was "significant concern about the proximity of the Griffiths['] pier and the proposed pier." Three months later, in May 2014, the Corps again asked about the proximity: "Does Mr. Griffith have any objections to the proposed pier?" Burns forwarded this question along to James Cherberg and asked him for "the wording you'd like me to use in responding to [the Corps]." Cherberg responded, "Like we talked before, this language to [the Corps] is fine: 'Mr. Cherberg intends to construct [a] dock included in the Purchase and Sale Agreement between himself and [Griffith].'" In July 2014, the Corps issued the permit.

In November 2014, the Cherbergs' attorney sent a demand letter for the execution of a joint use agreement. The demand letter included a proposed joint use agreement and a copy of the new dock design submitted to the Corps and City of Mercer Island. The Griffiths refused to sign the proposed joint use agreement. Instead, the Griffiths proposed the Cherbergs build a smaller dock with greater separation from their own dock. The Cherbergs rejected the Griffiths' proposed dock.

The Cherbergs filed suit in May 2015, seeking specific performance to compel the Griffiths to sign the joint use agreement. Following discovery and briefing, in April 2016, the trial court granted the Cherbergs' motion for summary judgment finding that the Griffiths had breached the purchase and sale agreement. The trial court then denied the Griffiths' motion for reconsideration and granted the Cherbergs' motion for specific performance. The Griffiths appeal.

## ANALYSIS

### Standard of Review

We review an order granting summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56 (c); Hearst, 154 Wn.2d at 501. "In the contract interpretation context, summary judgment is not proper if the parties' written contract, viewed in the light of the parties' other objective manifestations, has two or more reasonable but competing meanings." Renfro v. Kaur, 156 Wn. App. 655, 661, 235 P.3d 800 (2010) (internal quotations omitted).

When a party seeks specific performance of a contract, rather than damages, a higher standard of proof must be met: "clear and unequivocal evidence that leaves no doubt as to the terms, character, and existence of the contract." Kruse v. Hemp, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993) (internal quotations and citations omitted). When reviewing a summary judgment decision involving a heightened standard of proof, we "must view the evidence presented through the prism of the substantive

evidentiary burden." Kofmehl v. Baseline Lake, LLC, 167 Wn. App. 677, 694, 275 P.3d 328 (2012), aff'd, 177 Wn.2d 584, 601, 305 P.3d 230 (2013). Even when "the evidence points strongly to" one party's reading of the contract, summary judgment granting specific performance should be denied if "the evidence is not so strong as to foreclose all other interpretations." Kofmehl, 177 Wn.2d at 601.

*Contract Interpretation*

"The touchstone of contract interpretation is the parties' intent." Tanner Elec. v. Puget Sound Power & Light Co., 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). Washington follows the "objective manifestation theory" of contract interpretation. "[W]e attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst, 154 Wn.2d at 503. "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst, 154 Wn.2d at 504.

To assist in determining the parties' intent, we also apply the "context rule" adopted in Berg v. Hudesman, 115 Wn.2d 657, 669, 801 P.2d 222 (1990). This rule "allows examination of the context surrounding a contract's execution, including the consideration of extrinsic evidence to help understand the parties' intent." Viking Bank v. Firgrove Commons, 183 Wn. App. 706, 713, 334 P.3d 116 (2014). The court may consider a variety of extrinsic evidence including: (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties, (4) the reasonableness of the parties' respective interpretation, (5) statements made during preliminary negotiations, (6) usages of trade,

and (7) the course of dealing between the parties. Spectrum Glass Co., Inc. v. Pub. Util. Dist. No. 1 of Snohomish County, 129 Wn. App. 303, 311, 119 P.3d 854 (2005). "Extrinsic evidence may be considered regardless of whether the contract terms are ambiguous." King v. Rice, 146 Wn. App. 662, 671, 191 P.3d 946 (2008). "But extrinsic evidence may not be used to (1) establish a party's unilateral or subjective intent as to the meaning of a contract word or term; (2) to show an intention independent of the instrument; or (3) to vary, contradict, or modify the written word." Renfro, 156 Wn. App. at 662-63 (internal quotations omitted).

Contract interpretation is a question of law and appropriate for summary judgment "only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." Tanner, 128 Wn.2d at 674. Summary judgment is "inappropriate when more than one reasonable inference can be drawn from the extrinsic evidence." Kelley v. Tonda, 198 Wn. App. 303, 313, 393 P.3d 824 (2017).

*The Purchase and Sale Agreement*

The Griffiths argue that the trial court erred in granting summary judgment and ordering specific performance because the purchase and sale agreement itself, and extrinsic evidence, support competing inferences as to the parties' intent.

A.    The Purchase and Sale Agreement is Ambiguous

The Cherbergs sought specific performance to enforce the following language in the addendum to the purchase and sale agreement:

> Seller acknowledges receipt of the NEW DOCK email copy from Ted
> Burns outlining the proposed dock Buyer intends to pursue. Seller further

> acknowledges the receipt of a copy of the lateral lines plot from King County Records and the proposed Dock sketch.
>
> Seller further agrees to sign a Joint Use Agreement as attached which will allow the Buyer to place the proposed dock within the 35 foot setback usually required.

The Cherbergs assert that the intent of this language is unambiguous—that the Griffiths agreed to sign a joint use agreement for any dock they could get approved anywhere within the 35-foot setback, apparently without consideration of the resulting impact it would have on the Griffiths' use of their existing dock. We disagree.

The language in the addendum is far from unambiguous. The addendum refers to "the proposed dock" but then fails to describe the proposed dock. While the blank form joint use agreement references a drawing of the proposed dock as "Attachment C," there was no attachment included with the addendum. The only drawing provided to the Griffiths was the sketch attached to the June 6 e-mail from the Cherbergs' contractor Ted Burns. The sketch, however, is for a dock that is both smaller than, and farther away from the Griffiths' dock, than the dock the Cherbergs ultimately permitted. It is unreasonable to believe that the parties agreed to approval of an undefined dock. On its face, the addendum is ambiguous as to the size or location of "the proposed dock."

B.    Extrinsic Evidence

The Griffiths assert that extrinsic evidence supports an inference that the parties intended future discussions and agreement on the precise location of "the proposed dock." There are several lines of extrinsic evidence that, viewed in a light most favorable to the Griffiths, support the Griffiths' interpretation.

-10-

At the outset, it was evident during the initial negotiations leading up to the purchase and sale agreement that the Griffiths were not willing to allow significant impact to their existing dock. They initially listed the property as a "no dock" property. After the Cherbergs expressed interest in a building a small dock, the Griffiths agreed that they would not object to a modest dock so long as it did not interfere with their dock. These preliminary discussions support an inference that the parties intended to cooperate and reach agreement.

Moreover, there is ample extrinsic evidence of the parties' subsequent conduct to support an inference that they intended to continue discussions and reach agreement. First, the day after the parties finalized and signed the second addendum, James Cherberg sent realtor Robbs an e-mail expressing concern about whether the Griffiths would move their float, and if not, how close could they encroach. Second, six months later, on January 11, 2013, the Cherbergs' attorney e-mailed the Griffiths' attorney with an update concerning the ongoing permitting process. The e-mail concluded, "<u>Once Cherberg and Griffith are agreed on the dock location</u>, then we can look at the Joint Use Agreement, etc."[4] Third, ten days later, James Cherberg e-mailed the Griffiths with his own status update. Cherberg explained that he would have his dock builder provide "a detailed scaled drawing of this location and access to the dock <u>and its acceptability to you</u>." The e-mail continued, "I have Cc'ed this email to my attorney to keep him in the loop, as you have requested [your attorney] review [the joint use agreement] with him <u>after we have agreed on the dock location and access</u>."[5] And finally, that same day,

---

[4] (Emphasis added.)
[5] (Emphasis added.)

Cherberg e-mailed his dock designer asking for a detailed drawing by his surveyor M.W. Marshall, showing the proposed dock location, access, and configuration. Cherberg explained, "I will need to get Hal Griffith's verbal agreement as to location before having Marshall begin his drawing."[6]

Construing the evidence and all reasonable inferences in favor of the Griffiths, the nonmoving parties, the purchase and sale agreement as well as the subsequent conduct of the parties supports at least a reasonable inference that "the proposed dock" was not yet final at the time that the purchase and sale agreement was signed and that the parties expected to continue discussions and reach agreement on the size and location of the dock. Thus, because there are at least two reasonable competing interpretations of the purchase and sale agreement, summary judgment was not appropriate. Renfro, 156 Wn. App. at 661.

The Griffiths argue also that the Cherbergs acted in bad faith by making misrepresentations to the Army Corps of Engineers during the permitting process thereby barring the Cherbergs from equitable relief, including specific performance. Because we are remanding for trial, we decline to address this issue on summary judgment.[7]

We affirm the order denying the Griffiths' partial motion for summary judgment, reverse the order granting the Cherbergs' motion for summary judgment and ordering specific performance, and remand for trial.

---

[6] (Emphasis added.)

[7] During oral argument and in postargument letters submitted to the court, the parties disputed whether the right to a dock was a material term of the purchase and sale agreement. Because this argument was not raised below, and not briefed on appeal, we decline to address it.

No. 75276-6-I/13

Mann, J.

WE CONCUR:

Leach, J.                    Dwyer, J.

-13-