[No. 41711-1-II.   Division Two.   December 18, 2012.]

GARY E. CHEVALIER, *Respondent*, v. GARY WOEMPNER ET AL.,
*Appellants*.

*Charles W. Talbot*; and *Peter T. Petrich* and *Rebecca M. Larson* (of *Davies Pearson PC*), for appellants.

*Timothy A. Reid*, for respondent.

¶1 Van Deren, J. — Gary Woempner appeals the trial court's award of $96,122.75, plus $137,089.48 in prejudgment interest, to Gary Chevalier for a 49 percent interest in Alki International Inc., Woempner's solely owned corporation. In his initial briefing, Woempner argued that (1) substantial evidence did not support the finding that Woempner and Ronald Bequette entered into a partnership agreement, (2) the corporate form of Alki precluded a finding that a partnership existed, and (3) any partnership agreement was void for illegality. After oral argument and our examination of the record, we asked the parties for additional briefing and evidence relating to Bequette's alleged ownership of an option interest in Alki that Chevalier claims was the basis of a partnership purchase from Bequette. Based on our review of the record, we hold that Bequette's sale to Chevalier of "49 Shares of Option for Alki Int'l" in 1996 did not convey any property interest to Chevalier because no evidence supports Bequette's ownership of 49 shares of an option in Alki. Ex. 24. We also hold that RCW 25.05.055 precludes a finding that Bequette had a partnership interest in Alki. Accordingly, we reverse the trial court's finding that Chevalier owns an interest in Alki and vacate the resulting judgment in Chevalier's favor.

## FACTS

¶2 The facts of this case were highly contested at trial, and testimony focused on whether Bequette and Woempner formed a partnership absent any written evidence of a partnership agreement and whether that alleged partnership superseded or somehow owned Woempner's solely owned corporation, Alki. At times, the witnesses contradicted their earlier testimony, but at trial, Bequette maintained that he formed a partnership with Woempner and then sold his interest in the partnership to Chevalier for over $50,000, entitling Chevalier to one half of Woempner's corporation.

¶3 Chevalier admitted that he knew nothing about the formation of a partnership but maintained that his payment to Bequette entitled him to an ownership interest in Alki even though (1) he never saw any evidence that Bequette owned any interest in Alki, (2) Chevalier worked solely as an employee of Alki, (3) Chevalier claimed unemployment benefits from the company as an employee after April 1999, and (4) nothing changed in his work for Alki after he paid Bequette. Woempner denies that there was any partnership formed with Bequette at any time.

¶4 Woempner testified that he owned two moving and storage companies: Perry Moving and Storage Company Inc. and Ace Van and Storage Co. Inc. His companies conducted the actual transportation for Bequette's freight forwarding businesses: Admiral Forwarders Inc. and Alderwood Freight Forwarders Inc.[1] In the 1990s, Woempner began to consider entering the freight forwarding business.

¶5 Bequette has worked in the international freight forwarding business since 1985; and his freight forwarding companies work for the United States Armed Forces and arrange for the shipment of household goods and belongings when military personnel are transferred from one duty station to another.

¶6 In 1993, Admiral hired Chevalier. In 1994, Chevalier wanted to become involved in the international freight forwarding business as an owner and he discussed his desire to do so with Bequette. During their discussion, Bequette and Chevalier concluded that Chevalier would not be able to start his own business because he did not have enough assets to obtain a surety bond.[2]

---

[1] Bequette was awarded one of the companies in his divorce; at trial, he testified that he planned to sell the company to his brother.

[2] According to Chevalier, bonding companies require individuals or companies to have a million dollars in assets in order to get "bonded." Report of Proceedings (Oct. 22, 2003) at 145.

¶7 Bequette contacted Woempner and discussed Woempner's desire to start a freight forwarding company. Woempner, Chevalier, and Bequette had a lunchtime conversation wherein Bequette suggested that he and Woempner start a new freight forwarding business. According to Chevalier, Alki was not formed at that lunch, and Bequette stated that an agreement "didn't come to fruition in any single event" but in a series of subsequent telephone conversations. Report of Proceedings (Oct. 21, 2003 afternoon session) at 33. There were no other face-to-face meetings between Woempner and Bequette, and no formal agreement was reached regarding Bequette's participation in Alki at the restaurant meeting. Chevalier was not involved in any other conversations with Bequette and Woempner about forming a partnership.

¶8 Woempner denied any discussion that suggested that he would be a partner with Bequette or Chevalier, and he emphasized that if Bequette were to have an interest in another freight forwarding company, it would violate the rules applicable to these companies shipping for military families.[3] He agreed to have Chevalier be the office person for the new company he started.

¶9 Bequette testified that he proposed that the business be in Woempner's name with Bequette as a silent partner,

---

[3] For a freight forwarding company to qualify to conduct business with the military, the business must first be approved by the Military Travel Management Command (MTMC). The rules and regulations of the MTMC preclude a person from having common financial administrative control (CFAC) of more than one freight forwarding company competing for business in the same traffic channel. If the military command learns of a person owning more than one freight forwarding company, it may take away or suspend the license of the freight forwarding company.

Carriers that fail to disclose their CFAC relationships are subject to disqualification from Department of Defense transportation programs, debarment from federal contracting, criminal prosecution for false statements, and civil prosecution.

The CFAC program is an expression of procurement policy and procedure and is not considered a rule of general application to the public. Therefore, it is not published in the Code of Federal Regulations.

Clerk's Papers at 85.

advising Woempner who to contact and how to comply with license requirements. Bequette's name was not to appear on any documents relating to the business. Chevalier would run the day-to-day operations and, eventually, buy Bequette's share of the company. Bequette first testified that there was no discussion about the division of profits but later said that Alki's profits were to be split 50/50 until his sale. There is no written documentation of an agreement between or among Chevalier, Bequette, or Woempner. There is no evidence that Woempner ever split profits with Bequette.[4]

¶10 Woempner hired legal counsel in Washington, D.C., to assist in filling out the application to obtain a license for the freight forwarding business; he also paid $7,500 in license fees. Bequette's companies, Alderwood and Admiral, contributed money to assist in the formation of Alki, and Woempner repaid Admiral and Bequette for the costs advanced.

¶11 Woempner drafted the articles of incorporation for Alki, and on March 25, 1994, he filed the articles of incorporation with the secretary of state for the State of Washington. The principal office of the corporation was listed as Tacoma, Washington, but the Alki office operated out of Bothell, in the same building as Bequette's companies. Woempner's name is the only name that appears on Alki's articles of incorporation. The bylaws, dated May 20, 1994, listed Woempner as president and secretary of Alki. The corporate tax returns show only Woempner as the owner and the Alki bank accounts, as well as an A.G. Edwards account, were in only Woempner's name. Woempner never issued share certificates in Alki.

---

[4] Bequette could not decide whether payments from Alki to him or his businesses totaling $40,000 were profits or reimbursement of costs advanced. He also could not clarify whether a $20,000 payment from Alki to Bequette's father was so directed because of the MTMC regulations or due to Bequette's pending divorce. Bequette did not report the second $25,000 payment from Chevalier in his tax returns. And none of the payments from Alki were reported on Bequette's tax returns as profits.

¶12 Bequette agreed to sell Chevalier his interest in Alki for $50,750. Bequette and Chevalier executed a written contract in 1996 entitled "49 *Shares of Option* for Alki Int'l" under which Chevalier and Bequette maintain Chevalier purchased 49 percent of Alki for $50,750, plus interest. Ex. 24 (emphasis added). No money from this sale went to the corporation or Woempner and Woempner never signed any acknowledgement, nor did the corporate documents reflect the addition of another owner. The record does not reveal any testimony or evidence relating to Bequette's ownership or interest in any shares or an option for any shares in Alki.

¶13 In April 1999, Chevalier sued Woempner and Alki, seeking a declaratory judgment as to his rights and status with regard to his claimed ownership in Alki and alleging breach of contract and breach of fiduciary duties. The trial court concluded that Bequette's and Woempner's association created a partnership at will; that the written agreement conveying "49 *Shares of Option* for Alki Int'l" to Chevalier "reflected the parties' intent that Chevalier would purchase a 49% *interest in* Alki"; and that from April 1, 1996 to February 1999, Chevalier was entitled to 49 percent of the profits of Alki. Ex. 24 (emphasis added); Clerk's Papers at 177 (emphasis added). The trial court concluded that (1) Woempner exercised his right to dissociate himself from the partnership when he told Chevalier that he did not have an interest in Alki and (2) Woempner's exercise of his right to dissociate himself required dissolution of the partnership and a winding up of its business affairs under RCW 25.05.300. The trial court dismissed all claims against Bequette.

¶14 On August 9, 2010, a second trial was held to determine the value of Chevalier's interest in Alki from April 1, 1996, through February 1999. On January 14, 2011, the trial court awarded Chevalier $96,122.75 for his share

474

of the Alki partnership and $137,089.48 in prejudgment interest. Woempner appeals.[5]

## ANALYSIS

### I. STANDARD OF REVIEW

■ ¶15 We review a trial court's findings of fact and conclusions of law to determine whether substantial evidence supports the findings and, if so, whether the findings support the trial court's conclusions of law. *Scott v. Trans-Sys., Inc.*, 148 Wn.2d 701, 707-08, 64 P.3d 1 (2003). "Substantial evidence" is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We review conclusions of law de novo. *Sunnyside Valley*, 149 Wn.2d at 880. "Appellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact. Instead, they must defer to the factual findings made by the trier-of-fact." *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009).

### II. THE OPERATIVE DOCUMENT

¶16 The parties focus their arguments on the trial court's findings of facts and conclusions of law regarding the parties' intent to form a partnership, why Alki was a corporation solely owned by Woempner, and Bequette's purported sale of a 49 percent interest in Woempner's business. But we need not reach those issues because the operative document, the sale document between Bequette to Chevalier, did not convey anything more than shares in an "option," the existence of which was not proved at trial.

[5] Woempner appeals (1) the order denying his motion for summary judgment entered on September 5, 2000, (2) the order dismissing Bequette on July 27, 2004, (3) the findings of fact and conclusions of law entered on July 27, 2004, (4) the amended findings of fact and conclusions of law and declaratory judgment entered on November 5, 2004, and (5) the findings and fact and conclusions of law and judgment entered on January 14, 2011.

Therefore, the trial court's findings that a partnership was formed between Bequette and Woempner and then between Woempner and Chevalier are not supported by substantial evidence and its conclusions of law fail for lack of support in the findings.

A. Bequette Drafted a Document Selling Chevalier 49 Shares of an Option in Alki

¶17 Bequette drafted the agreement he and Chevalier executed. That document is entitled: "49 *Shares* of Option for Alki Int'l" under which Chevalier argues he purchased 49 percent of Alki for $50,750, plus interest, with all money paid to Bequette. Ex. 24 (emphasis added). The agreement further provided that Chevalier's nonpayment of the sum due would result in the "option" reverting to Bequette. Ex. 24. Bequette did not explain at trial why, if he was selling a partnership interest in Alki, he referred to this interest as an "option" in the agreement.[6]

¶18 The testimony is undisputed that Bequette did not hold any shares in Alki; the record shows that Bequette told Chevalier that the document conveyed a partnership interest in Alki, despite Bequette's draft conveyance twice referring to sale of shares of an "option"; and Bequette never testified that he owned shares in an option in Alki. Neither Bequette nor any other witness testified that Bequette had earned, purchased, or was entitled to 49 shares of an option in Alki. And the trial record is devoid of evidence of the creation of an option interest, its value, when or how it had to be exercised, whether other shares of an option existed, and who might have owned any remaining option shares. Moreover, when directed to address the issue of an option's existence and effect in supplemental briefing, Chevalier merely maintained that the option agreement and its execution for 49 shares of an option was the sole agreement

---

[6] He could not explain what happened to the other one percent of his purported interest. And in his supplemental briefing, Chevalier failed to explain the nature of the "[s]hares of an [o]ption" that he purchased from Bequette. Ex. 24.

representing the Bequette-Chevalier sale. Finally, there is no evidence in the record supporting the trial court's finding and conclusion that the value of 49 shares of an option was equivalent to a 49 percent interest in Alki.

B. Chevalier Purchased Shares of an Option in Alki That Was Not Proved at Trial

¶19 An option contract is "a complete, valid and binding agreement" to which general contract principles apply. *Bennett Veneer Factors, Inc. v. Brewer*, 73 Wn.2d 849, 853, 441 P.2d 128 (1968). In applying these general contract principles, our primary goal in interpreting the option contract is to ascertain the parties' mutual intent. *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996). Under Washington's "objective manifestation" theory of contracts, we determine the parties' intent by focusing on the objective manifestations expressed in their contract rather than focusing on the parties' unexpressed subjective intentions. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). In other words, we "impute an intention corresponding to the reasonable meaning of the words used" in the contract. *Hearst*, 154 Wn.2d at 503. Thus, the parties' subjective intent "is generally irrelevant if the intent can be determined from the actual words used" in the contract. *Hearst*, 154 Wn.2d at 503-04. And "[w]e do not interpret what was intended to be written but what was written." *Hearst*, 154 Wn.2d at 504. Accordingly, we give language in the option contract its ordinary, usual, and popular meaning unless the contract clearly demonstrates a contrary intent. *Hearst*, 154 Wn.2d at 504. We construe ambiguities in a contract against the drafter. *Rouse v. Glascam Builders, Inc.*, 101 Wn.2d 127, 135, 677 P.2d 125 (1984).

¶20 Although stocks and stock options are both transferable property interests, the character of the property interests differ; "[s]tock may be converted when it is sold, but stock options, as a right to purchase stock, disappear when

the owner exercises the options and purchases the stock. Once the owner exercises the options, he has irrevocably exchanged one kind of property (stock options) for another kind of property (stock)." *In re Marriage of Langham*, 153 Wn.2d 553, 565, 106 P.3d 212 (2005). Thus, Bequette's purported ownership of stock options in Alki did not equate with an ownership interest in Alki. Likewise, under the sales contract, Bequette sold his purported property interest in "49 Shares of Option for Alki Int'l" to Chevalier, not a 49 percent ownership interest in Alki.[7] Ex. 24.

¶21 Here, the evidence at trial, including the unambiguous language used in the sales agreement, is conclusive that Bequette sold Chevalier 49 shares of a purported option he held for an interest in Alki. But Bequette told Chevalier and testified at trial that the "option" sale was really a sale of a purported partnership interest in Alki. There being no evidence supporting the existence of 49 (or more) shares of an option owned by Bequette, there is likewise no evidence supporting the trial court's conclusion that Bequette's sale to Chevalier of shares of an option he did not own, or even claim to own, legally transferred a partnership interest in Alki.

¶22 Thus, although the parties focused on whether substantial evidence supported the trial court's finding of a partnership between Bequette and Woempner, these findings are irrelevant to whether Bequette actually conveyed a partnership interest to Chevalier. Bequette's own unambiguous writing conveyed only shares of an option in Alki, an interest the record does not indicate even existed. Thus, he conveyed 49 shares of an unproven option to Chevalier.

---

[7] Even if Bequette held an option interest in Alki, Chevalier's purchase of 49 shares of that option would not support a finding that Chevalier owned 49 percent of Alki. First, there is no evidence of how many option shares were issued or what the substance of the option was. Second, to convert an option into stock ownership requires a purchase of the stock, i.e., Chevalier would owe the corporate owner (presumably Woempner) for the shares of stock at the preset option price.

III. No Substantial Evidence of Bequette's Alleged Partnership Interest

¶23 Even if the language of the sales agreement had demonstrated Bequette's intent to convey a partnership interest in Alki to Chevalier, substantial evidence does not support the finding that Bequette and Woempner formed a partnership and, thus, does not support the trial court's conclusion that Bequette owned any interest in Alki that he could sell to Chevalier. Bequette testified that he transferred his interest in Alki to Chevalier through the sales agreement. Chevalier maintains that position in his supplemental briefing. "It is undeniable that . . . Bequette intended to, and did, transfer his interest in Alki International to . . . Chevalier. The vehicle for that transfer was Exhibit 24 [(the option agreement)]." Suppl. Br. of Resp't at 8. But the record does not support a finding that Bequette had the interest in Alki that was conveyed by the option purchase agreement, exhibit 24.

¶24 Bequette's writing regarding his ownership and transfer of an interest in shares of an option in Alki directly contradicts his trial testimony that he and Woempner formed a partnership. If Bequette is to be believed at all given the nature of his testimony, at best he and Woempner formed an association under the Washington Business Corporation Act, Title 23B RCW.

¶25 RCW 25.05.055 controls the formation of business partnerships in Washington and states in relevant part:

(1) *Except as otherwise provided in subsection (2) of this section*, the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership.

(2) *An association formed under a statute other than this chapter*, a predecessor statute, or a comparable statute of another jurisdiction *is not a partnership* under this chapter.

(Emphasis added.) Under the plain language of these provisions, an association formed under the Washington

Business Corporation Act *"is not a partnership."* RCW
25.05.055(2) (emphasis added). Under RCW 25.05.055, it is
irrelevant whether the parties intended to use the corpo-
rate form merely as a medium for representing their
partnership because RCW 25.05.055(2) provides that once
an association has been formed under another statute, that
association is not a partnership.

¶26 Bequette wanted Chevalier to pay him over $50,000
and convinced Chevalier to do so by representing that
Bequette held a 50 percent interest in Alki. Bequette then
drafted, and he and Chevalier executed, a written contract
in 1996 entitled "49 *Shares* of Option for Alki Int'l," under
which the trial court found that Chevalier purchased 49
percent of Alki for $50,750, plus interest, paid to Bequette.
Ex. 24 (emphasis added). No money from this sale went to
the corporation or Woempner. No documentation of the
valuation of Bequette's share or option interest exists in the
record, nor is there any documentation or evidence that
Bequette owned the option he sold to Chevalier.[8]

¶27 The trial court's conclusion that the parties formed a
partnership is contrary to the plain language of RCW
25.05.055, and substantial evidence does not support it. The
evidence shows that Bequette knew how to create advan-
tages for himself, that he told Chevalier that he owned an
interest in Alki, and that he sold Chevalier 49 shares of an
unproven option in Alki. The evidence is also clear that
Chevalier did not know about and was not involved with
any partnership formed between Bequette and Woempner.
He simply believed Bequette's representations about his
ownership. But this is not sufficient evidence to support the
trial court's disregard of Woempner's legal corporate own-

---

[8] And perhaps not remarkably, despite Bequette's and Chevalier's insistence
that they were partners with Woempner from 1994 until the trial court's 2003
ruling that Chevalier owned a partnership interest in Alki and until final ruling
in 2010, and their insistence that they were entitled to a share of the partnership's
value and profits, they failed to file any partnership tax returns related to Alki
with the federal government. Wash. Court of Appeals oral argument, *Chevalier v.
Woempner*, No. 41711-1-II (May 15, 2012) at 19 min., 3 sec. (on file with court).

ership and operation of Alki or the trial court's conclusion that Bequette's sale of shares in an option in Alki to Chevalier (with no evidence of ownership and reasonable value of the shares) was actually a partnership transaction among Bequette, Chevalier, and Woempner.

¶28 Because we hold that Chevalier held no interest in Alki through his payment to Bequette, we do not address the parties' other issues. We reverse the trial court's order finding that Chevalier owns an interest in Alki and vacate the judgment against Woempner and Alki in favor of Chevalier, and we remand for dismissal.

QUINN-BRINTNALL, J., concurs.

¶29 PENOYAR, J. (dissenting) — Unencumbered by legal representation, the parties succeeded in creating and operating a successful business but now must seek clarification of their relative legal rights. I part ways early with the majority because I believe substantial evidence supports the trial court's finding that a partnership was formed. I also agree with the trial court that this partnership was dissolved by Gary Woempner's assertion of full ownership and that Gary Chevalier was entitled to be awarded the value of Ronald Bequette's interest in the partnership. I would affirm and, therefore, respectfully dissent.

I. FINDING OF FACT 10

¶30 While Woempner assigns error to several findings of fact and conclusions of law, he specifically argues that substantial evidence does not support finding of fact 10. Finding of fact 10 is crucial because it is the primary basis for the trial court's conclusion that a partnership was formed. Because substantial evidence supports finding of fact 10, I conclude that the trial court did not err by concluding that a partnership was formed between Woempner and Bequette.

¶31 Finding of fact 10 reads:

In early 1994, Chevalier, Bequette and Woempner met at a restaurant in Bothell, Washington to discuss starting the business that would eventually be known as Alki. During that meeting, and in subsequent telephone conversations between them, Bequette and Woempner agreed that they would "be 50/50 partners" and split the profits of Alki (no written document on the discussion of this meeting); that the business would be run out of the same offices as the other A-Team businesses; that Woempner would establish a corporation, obtain necessary business licenses, and open a company bank account; that Woempner would use a lawyer in Washington, D.C. whose name was provided by Bequette to obtain the bond, Interstate Commerce Commission permit, and assist with other regulatory issues; that both Bequette and Woempner would advance funds to cover start-up costs; that Bequette's name would not appear on any of the "paperwork;" that Bequette would provide to Alki the list of port agents and shipping agents developed and used by [his companies]; that Chevalier would be responsible for contacting agents on Bequette's list to establish them as Alki agents; and that Chevalier would prepare and file the initial [letters of intent] LOI's for Alki while remaining on [Bequette's company's] payroll until such time as Alki had revenues sufficient to pay Chevalier's salary. In subsequent telephone conversations, Bequette also informed Woempner that Bequette intended to sell, and Chevalier intended [to] buy, Bequette's one-half interest in Alki at some time in the future. Woempner and Bequette did not agree to a specific term during which their agreement was to be performed.

Clerk's Papers (CP) at 373-74.

¶32 Woempner argues that no substantial evidence shows that an agreement was made and that there was no meeting of the minds regarding sharing ownership or splitting the profits. Woempner summarizes the differing accounts to show the conflicting testimony.

¶33 But the trial court issued finding of fact 25:

Woempner's testimony at trial was directly contrary to the testimony of Chevalier, Bequette, Fullaway, Kelly, and Roy

> Bequette on nearly every issue material to this case. The Court specifically finds that overall, [Chevalier's] version of facts are more credible. In particular, Woempner's testimony that he engaged Bequette as a "consultant" to assist him with the formation and start-up of Alki and that Bequette was to be paid a fee for his consulting work to be determined in Woempner's "sole discretion" was not credible.

CP at 382-83. We do not review credibility determinations. *Recreational Equip., Inc. v. World Wrapps Nw., Inc.*, 165 Wn. App. 553, 568, 266 P.3d 924 (2011). Chevalier testified that the three men met at a restaurant to discuss the formation of a freight forwarding business: Bequette and Woempner would be "50/50 partners," Chevalier would run the company, and eventually, Chevalier would purchase Bequette's share. Report of Proceedings (RP) (Oct. 22, 2003) at 237. Bequette testified that they discussed Alki International's formation at the restaurant and that the agreement "didn't come to fruition in any single event" but in a series of subsequent phone conversations. RP (Oct. 21, 2003, afternoon) at 33. Bequette added that he and Woempner agreed to be "50/50 partners" and that he told Woempner that he wanted to eventually sell his share to Chevalier. RP (Oct. 21, 2003, afternoon) at 80. The restaurant meeting and telephone conversations occurred before Woempner filed the articles of incorporation.

¶34 Regarding Woempner's contention that no agreement occurred at the restaurant and that the agreement was never reduced to writing, finding of fact 10 concludes that the agreement to be partners developed over the meeting *and* subsequent telephone conversations, and the finding acknowledges that there was no written documentation. Further, "the existence of a partnership depends upon the intention of the parties. That intention must be ascertained from all of the facts and circumstances and the actions and conduct of the parties." *Malnar v. Carlson*, 128 Wn.2d 521, 535, 910 P.2d 455 (1996). Substantial evidence supports finding of fact 10.

## II. The Partnership and Alki, The Corporation

¶35 Woempner contends that the trial court erred because the Revised Uniform Partnership Act, chapter 25.05 RCW, precludes the existence of a partnership where a business entity has been formed under another statute such as the Washington Business Corporation Act, Title 23B RCW. Chevalier responds that the formation of a corporation within a partnership does not preclude the partnership's existence. Because I agree with the trial court that the parties formed a partnership before Alki was formed, the question is whether Woempner's incorporation of Alki replaced the partnership with a corporation.

¶36 Woempner argues that the only business formed was Alki, the corporation. "The business existed as a corporation from that point forward and could not be a partnership."[9] Appellant's Br. at 26. RCW 25.05.055 does state that another business entity, such as a corporation, is not a partnership. But the question here is not whether a corporation can ever be a partnership. The question here is whether these parties formed a partnership and whether it continued to exist after the incorporation of Alki and until Woempner disassociated himself.

¶37 Woempner's argument starts and ends with his incorporation of Alki. But he fails to articulate how his incorporation of Alki terminated the partnership. The association of Bequette and Woempner was not formed under Alki; it was a partnership that predated Alki. Bequette was not issued shares or even mentioned in the incorporation documents. The trial court made no finding that the parties intended for Alki's formation to replace the partnership, nor was any evidence offered to support that notion.

---

[9] Woempner also posits, "While Petitioner Woempner denies that any agreement was ever formed, his position is that even if one had been, it would have been void because it did not comply with the Statute of Frauds. RCW 19.36.010(1)." Appellant's Br. at 23 n.2. But I decline to address this argument, as he does not develop it on appeal, contrary to RAP 10.3(a)(6). *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

¶38 Once formed, a partnership continues to exist until it is dissolved under RCW 25.05.300.[10] The trial court found that dissolution was required after Woempner gave notice to Chevalier of his express will to withdraw as a partner. *See* RCW 25.05.225(1), .300. Woempner advances no other dissolution-causing event under the statute, relying instead on the argument that the Alki corporation was the parties' intended form. Having rejected that proposition, I agree with the trial court that the partnership continued to exist until Woempner and Chevalier parted ways.[11]

III. VOID FOR ILLEGALITY

¶39 Woempner argues that the trial court erroneously concluded that he failed to prove his illegality-of-contract affirmative defense. He contends that any partnership between Bequette and Woempner was void because "the whole purpose and intent behind the purported partnership was illegal and against public policy." Appellant's Br. at 34. Because there is no evidence that violating the Military Traffic Management Command (MTMC) regulation amounts to an illegality and because the Woempner/Chevalier partnership did not violate the regulations, I would reject. Woempner's argument.

¶40 In general, courts "will not aid either party to an illegal agreement where a partnership is formed to carry out an illegal business or to conduct a lawful business in an illegal manner, the courts will refuse to aid any of the parties thereto in an action against the other." *Williams v. Burrus*, 20 Wn. App. 494, 497, 581 P.2d 164 (1978). An agreement violating a statute or municipal ordinance is generally void, but "this is not necessarily true where the

---

[10] RCW 25.05.300 addresses the events causing dissolution and winding up of a partnership.

[11] The parties have cited other cases where the line between an association as a partnership and/or a corporation was blurred. I do not find these authorities helpful because they are so different factually, none involving a validly formed partnership with two partners and the later formation of a corporation by only one of the partners.

agreement is neither immoral nor criminal in nature and the statute or ordinance subjects violators merely to a penalty without more." *Sienkiewicz v. Smith*, 97 Wn.2d 711, 716, 649 P.2d 112 (1982). Recovery should not be denied if the promise sued upon is only remotely or collaterally related to the illegal transaction and not illegal in and of itself. *Sherwood & Roberts-Yakima, Inc. v. Cohan*, 2 Wn. App. 703, 710, 469 P.2d 574 (1970).

¶41 Here, the agreement itself was not illegal. The regulations provide that a person having common financial administrative control of two or more forwarding companies could simply be disqualified from doing business where those companies compete. The existence of the companies does not become void. And criminal liability would attach to Woempner only for falsely representing to the Department of the Army that he was not in a business relationship with Bequette. Thus, although Bequette's involvement would perhaps have precluded Alki from obtaining a license, the association was not in and of itself illegal. And the partnership between Chevalier and Woempner did not violate MTMC regulations, where neither owned another freight forwarding company. Because the partnership agreement was not illegal, the trial court did not err by rejecting Woempner's illegality of contract defense.[12]

IV. THE EFFECT OF THE BEQUETTE-CHEVALIER SALE

¶42 The majority concludes that the Bequette/Chevalier sale agreement was ineffective. On its face, this document,

---

[12] Woempner relies primarily on *Williams*, but that case is inapposite. There, contrary to a statute forbidding awarding liquor licenses to partnerships with an unqualified member, the plaintiff, who was unqualified, formed a partnership with the defendant to purchase a restaurant with a liquor license. *Williams*, 20 Wn. App. at 495-96. When the plaintiff sought to dissolve the partnership, the court concluded that the agreement was illegal and unenforceable. *Williams*, 20 Wn. App. at 496. The court noted that the case was "not one wherein the promise sued upon is only remotely or collaterally related to the illegal transaction and not illegal in and of itself." *Williams*, 20 Wn. App. at 497. Here, by contrast, if there were an illegal agreement, it was between Bequette and Woempner, not between Chevalier and Woempner.

with the strange title of "49 Shares of Option for Alki Int'l," has little more legal clarity than "50 Ways to Leave Your Lover."[13] But Woempner has not argued that this sale agreement itself was ineffective and even if he did, and even if it was, Woempner's obligations would remain the same.

¶43 The parties' oral discussions clarified that they agreed: Bequette was selling a 49 percent interest in the business to Chevalier, and Woempner was agreeing to the sale so long as he retained a 51 percent ownership interest. Woempner does not argue about the substance of the sale agreement; he argues only that "no partnership was ever formed. Mr. Bequette never had any partnership interest that he could transfer to Mr. Chevalier. Mr. Chevalier never obtained any interest in Alki [the corporation]." Appellant's Br. at 33. Thus, he argues that (1) Bequette had no partnership interest to sell and (2) the agreement could not act to transfer shares in the Alki corporation. Notably, Woempner does not argue the agreement's efficacy as a sale of a partnership interest.

¶44 Because I agree with the trial court that a partnership was formed, I am given no reason to disagree with the trial court's conclusion of law 4, which states that the agreement effected a sale of a 49 percent partnership interest to Chevalier. Even if the sale was ineffective, Bequette would still have had his interest in the partnership. When Woempner dissolved the partnership, he would still have had the obligation to wind up the partnership, disgorge partners' profit shares, and settle partners' accounts. The funds owed would simply be owed to Bequette instead of Chevalier. Since the record clearly reflects that Bequette assigned any interest he had in the business to Chevalier, there is no reason to remand on this basis. Finally, the result does not blur the line between a partner-

---

[13] *See* PAUL SIMON, *50 Ways to Leave Your Lover, on* STILL CRAZY AFTER ALL THESE YEARS (Warner Bros. Records 1975).

ship and a corporation. Any interest in Alki, the corporation, remains Woempner's.

¶45 Though the parties' impressionistic legal expressions are inexact, their actual agreements are clear: A partnership was formed between Bequette and Woempner. Woempner formed a corporation to be the public face of partnership operations. The business flourished. Bequette sold a 49 percent interest in the partnership to Chevalier, and Woempner agreed to the sale so long as he retained a 51 percent ownership interest. Woempner acted to dissolve the partnership, and he must account to Chevalier as Bequette's successor. The trial court properly ascertained the parties' actual intent throughout their dealings and awarded judgment to Chevalier. I would affirm.