# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WEST COAST SELF STORAGE LLC, | No. 86506-4-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, | |
| Respondent. | |

MANN, J. — West Coast Self Storage Group (West Coast) provides development, construction management, and property management services to owners of self-storage facilities. West Coast entered into an Affiliation Agreement, followed by Development Agreements and Construction Management Agreements (CMA) with Catalyst Storage Partners LLC (Catalyst) to develop and construct five self-storage facilities in Washington.

After an audit, the Department of Revenue (Department) determined that West Coast was responsible for construction of the self-storage facilities and assessed the retail sales classification of the business and occupation (B&O) tax under RCW 82.04.250, and the retail sales tax under RCW 82.08.020. West Coast appeals a decision by the Board of Tax Appeals (Board) affirming the assessments.

We affirm the assessment.

I

A

West Coast provides development, construction management, and property management services to owners of self-storage properties in Washington, Oregon, and California. West Coast is not a licensed contractor. In 2008, West Coast entered into an "Affiliation Agreement" with Catalyst Storage Partners LLC (Catalyst).[1] The Affiliation Agreement provided the framework in which West Coast agreed to identify sites to be developed into self-storage facilities that would be owned, acquired, or leased by Catalyst. The Affiliation Agreement set forth the process by which projects would be approved for development and construction. The Affiliation Agreement included as exhibits a model Development Agreement, Acquisition Agreement, Management Services Agreement, and Construction Management Agreement (CMA).

Relevant here are West Coast's development services and construction management services related to five projects: Padden Parkway, Columbia City, Sheridan Beach, West Seattle, and East Vancouver. West Coast entered into Development Agreements with Catalyst for each project. Under the Development Agreements, West Coast provided the following services: site identification, site evaluation, preparation of purchase and sale agreement, entitlements and design, due diligence, preparation of a real estate package, site coordination, and obtaining building permits.[2]

---

[1] Catalyst is short for both Catalyst Storage Seattle (CSS) and Catalyst Storage Partners (CSP).
[2] It is undisputed that the Development Agreements for each project are materially similar and so for clarity we refer to them collectively.

The Development Agreements also required West Coast to find a qualified general contractor, negotiate a construction contract, and obtain and negotiate bid proposals for the major cost elements. The Development Agreements incorporated a model CMA as an exhibit. West Coast was compensated with a development fee of 2 percent of the total project cost with 25 percent due upon initial project approval and the remaining 75 percent when Catalyst granted construction approval.

West Coast and Catalyst then entered into CMAs for the five projects.[3] Consistent with the model CMA, section 3 of the Padden Parkway, Columbia City, Sheridan Beach, and East Vancouver CMAs listed the "construction services to be performed by" West Coast, as "Construction Manager." The Construction services included, in relevant part:

> 4.1. Construction of Improvements. The Owner hereby engages and authorizes Construction Manager to perform or provide the services described in this Section 4 relating to the construction of the improvements. Construction Manager hereby agrees to perform or provide such services. . . .
>
> 4.2. Services to be performed by Construction Manager During Construction. Construction Manager shall monitor and use its best efforts to cause the construction of improvements to proceed and be completed in accordance with or in advance of the schedule, which efforts shall include, without limitation, the following responsibilities: . . .[4]
>
> 4.7 Substantial and Final Completion.
>
> (a) Construction Manager shall cause construction of the improvements to proceed so that the improvements are substantially completed and then finally completed (i) within the Development Budget, (ii) in a good and workmanlike manner in accordance with the plans and specifications and all legal requirements, and (iii) in accordance with the Schedule. [West Coast] shall not permit the construction of the improvements to be

---

[3] It is undisputed that the CMAs are materially similar and so for clarity we refer to them collectively. The few differences among the agreements are noted in the discussion below.

[4] For the Sheridan Park CMA, these paragraphs are renumbered as paragraphs 3.1 and 3.2.

abandoned or permanently discontinued. Construction Manager shall promptly give notice to the Owner of the completion of the improvements.[5]

The West Seattle CMA included several changes in language. First, a new recital was added stating that West Coast, as the Owner's Representative, was not responsible for the actual performance of the construction:

> Owner acknowledges and agrees that Owner's Representative is not a licensed contractor, it will only act in the capacity as an adviser to and representative of Owner, and nothing in this Agreement makes Owner's Representative responsible for the actual performance of the construction of the project.

Second, the "constructive services" section and paragraphs were renumbered as paragraph 3, and relabeled as "constructive oversight and advisory services." The language of the services was modified as follows:

> 3.1.　Construction of Improvements. The Owner hereby engages and authorizes Owner's Representative to perform or provide the oversight and advisory services described in this Section 3 . . . relating to the construction of the improvements. Owner's Representative hereby agrees to perform or provide such services.
>
> 3.2　Services to be Performed by Owner's Representative During Construction. Owner's Representative shall monitor, on behalf of the Owner, and make progress reports to Owner and make necessary recommendations to cause the General Contractor's construction of the improvements to proceed and be completed in accordance with or in advance of the schedule, which efforts shall include, without limitation, the following responsibilities:
> 　　. . . .
>
> 3.7　Substantial and Final Completion. Owner's Representative, as adviser to the Owner, shall provide status report to the Owner and make recommendations to cause the General Contractor's construction of the

---

[5] Paragraph 3.7 was modified in the Sheridan Beach CMA to read: "Construction Manager, as adviser to the Owner, shall cause constructions of the improvements to proceed."

improvements to proceed so that the improvements are substantially completed and then finally completed (i) within the Development Budget, (ii) in a good and workmanlike manner in accordance with the plans and specifications and all legal requirements, and (iii) in accordance with the schedule. Construction Manager shall not permit the construction of the improvements to be abandoned or permanently discontinued by the General Contractor. Construction Manager shall promptly give notice to the Owner of the completion of the improvements.

B

The Department audited West Coast for the period January 1, 2011, to December 2015. The Department concluded that West Coast's revenue for development and construction management services fell within the retail sales classification of the B&O tax under RCW 82.04.250, and the retail sales tax under RCW 82.08.020. The Department assessed $246,975 in retail sales tax, $12,469 in retailing B&O tax, $71,976 in service and other activities B&O tax, $14,271 in interest, and a $16,571 penalty.

West Coast appealed the assessment to the Department's Administrative Review and Hearing Division. The reviewing officer first affirmed the assessment, but on reconsideration granted the petition for the portion of the revenue derived from work under the Development Agreements, and denied the petition for the portion of the revenue derived from work under the CMAs. On remand to address the portion of development income, the Department could not differentiate between income received under the Development Agreements from income received under the CMAs. As a result, the Department made no change to the original assessment.

West Coast appealed to the Board and moved for summary judgment. A tax referee entered an initial decision denying summary judgment to West Coast, but

granting it to the Department.  West Coast sought review before the full Board, which denied the petition and adopted the initial decision as its own.  The final decision included the following relevant conclusions of law:

14. The terms of the Affiliation Agreement, Development Agreements, and Construction Management Agreements clearly show that, at the time the Development Agreements were executed, the parties to the agreements contemplated that [West Coast] would be awarded both Development Agreements and Construction Management Agreements.  "In construing a contract, a court must interpret it according to the intent of the parties as manifested by the words used."

15. Because the parties to the Development and Construction Management Agreements, at the time the Development Agreements were entered into, contemplated that the same party would be awarded both contracts, the Agreements are combined and taxed as a single activity. RCW 82.04.051(2) and (3).

16. [West Coast] is the party responsible for construction because Paragraph 4.7(a) of the Construction Management Agreements clearly states that [West Coast] is required to:

> [C]ause construction of the improvements to proceed so that the improvements are substantially completed and then finally completed (i) within the Development Budget, (ii) in good and workmanlike manner in accordance with the plans and specifications and all legal requirements, and (iii) in accordance with the schedule.  [West Coast] shall not permit the construction of the improvements to be abandoned or permanently discontinued.

17. In the event [West Coast] breaches this term of the Agreements, [West Coast] is in breach and is liable for damages.  The fact that another party may also be liable does not relieve [West Coast] of its legal obligations under the Agreements.

18. Because [West Coast] is responsible for the construction and the predominant activity under the agreements is services rendered in respect to constructing buildings or other structures, it is subject to retail B&O tax and retail sales tax for all activities under the Agreements.

West Coast petitioned for review by the Snohomish County Superior Court. The superior court transferred the petition to this court under RCW 34.05.518(1)(a), (b)(i).

II

A

We review decisions by the Board under the Administrative Procedure Act (APA), ch. 34.05 RCW. Echo Glob. Logistics, Inc. v. Dep't of Revenue, 22 Wn. App. 2d 942, 945, 514 P.3d 704 (2022). Relevant here, under the APA, this court may grant relief if the Board "erroneously interpreted or applied the law." RCW 34.05.570(3)(d); Steven Klein, Inc. v. Dep't of Revenue, 183 Wn.2d 889, 895, 357 P.3d 59 (2015). Because the Board's decision was on summary judgment, this court must "overlay the APA 'error of law' standard of review with the summary judgment standard and review an agency's interpretation or application of the law de novo while viewing the facts in the light most favorable to the nonmoving party." Echo Glob. Logistics, 22 Wn. App. 2d at 945. The Board may grant a motion for summary judgment "if the written record shows that, viewing the evidence in a light most favorable to the nonmoving party, there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law." WAC 456-09-545; WAC 456-10-503.

"A reviewing court must accord substantial weight to an agency's interpretation of a statute within its expertise, and to an agency's interpretation of rules that the agency promulgated.'" PeaceHealth St. Joseph Med. Ctr. v. Dep't of Revenue, 9 Wn. App. 2d 775, 779, 449 P.3d 676 (2019) (quoting Verizon Nw., Inc. v. Emp't Sec. Dep't, 164 Wn.2d 909, 915, 194 P.3d 255 (2008)), aff'd 196 Wn.2d 1, 468 P.3d 1056 (2020). As the agency charged with assessing and collecting taxes, the Department is entitled to

this deference.  See RCW 82.01.060(1) (department of revenue assesses and collects all taxes).

As the party asserting invalidity, West Coast bears the burden of demonstrating the invalidity of agency action.  RCW 34.05.570(1)(a).[6]

B

Washington imposes B&O tax for the "act or privilege of engaging in business activities."  RCW 82.04.220(1).  Most services and other activities not specifically taxed under another classification are subject to B&O tax under the "service and other" classification.  RCW 82.04.290(2).  Such services are taxed at a higher B&O rate than most activities, but importantly, are not subject to retail sales tax.

In contrast, Washington imposes a retail sales tax and a B&O tax on retail sales related to construction.  RCW 82.04.250; RCW 82.08.020.  For construction, a retail sale is defined, in relevant part, as:

> [T]he sale of or charge made for . . . labor and services rendered in respect to . . . [t]he constructing, repairing, decorating, or improving of new or existing buildings or other structures under, upon, or above real property of or for consumers.

RCW 82.04.050(2)(b).

In 1999, the Washington Legislature adopted RCW 82.04.051 and defined "services rendered in respect to" in the context of "constructing, building, repairing,

---

[6] West Coast assigns error to the Board's grant of summary judgment in favor of the Department, the nonmoving party.  But summary judgment for the nonmoving party is appropriate when there are no disputed facts and the nonmoving party is entitled to judgment as a matter of law.  See Impecoven v. Dep't of Revenue, 120 Wn.2d 357, 365, 841 P.2d 752 (1992); Guardado v. Taylor, 17 Wn. App. 2d 676, 686, 490 P.3d 274 (2021).  West Coast provides no argument on the claimed error and so we decline to address it further.  Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010) ("A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment.").

improving, and decorating of buildings and other structures." LAWS OF 1999, ch. 212, §§

1-2. The legislature explained its reasoning:

> "services rendered in respect to constructing buildings or other structures" has generally included the entire transaction for construction, including certain services provided directly to the consumer or owner rather than the person engaged in the performance of the constructing activity. Changes in business practices and recent administrative and court decisions have confused the issue. It is the intent of the legislature to clarify which services, if standing alone and not part of the construction agreement, are taxed as retail or wholesale sales, and which services will continue to be taxed as a service.

LAWS OF 1999, ch. 212, § 1(1). The legislature clarified that the entire price for

construction was to continue to be taxed as a retail sale:

> (2) It is further the intent of the legislature to confirm that the entire price for the construction of a building or other structure for a consumer or owner continues to be a retail sale, even though some of the individual services reflected in the price, if provided alone, would be taxed as services and not as separate retail or wholesale sales.

LAWS OF 1999, ch. 212, § 2.

Accordingly, RCW 82.04.051(1) defines the phrase "services rendered in respect

to" as

> those services that are directly related to the constructing, building, repairing, improving, and decorating of buildings or other structures and that are performed by a person who is responsible for the performance of the constructing, building, repairing, improving, or decorating activity.

(Emphasis added.) As of the time of the tax periods at issue here, the term "services

rendered in respect to" did not include certain professional services as:

> engineering, architectural, surveying, flagging, accounting, legal, consulting, land development or management, or administrative services provided to the consumer of, or person responsible for performing, the constructing, building, repairing, improving, or decorating services.

Former RCW 82.04.051(1) (1999).[7]

RCW 82.04.051(1) defines the phrase "responsible for the performance" as the person who "is obligated to perform the activities, either personally or through a third party." RCW 82.04.051(4)(b). This does not, however, include "[a] person who reviews the work for a consumer, retailer, or wholesaler, but does not supervise or direct the work." RCW 82.04.051(4)(b).

RCW 82.04.051(2) addresses the situation where a person might be subject to a services tax under RCW 82.04.290(2) for part of a contract or agreement, but also be subject to a construction tax under RCW 82.04.250. Resolution of this question focuses on the predominant activity:

> (2) A contract or agreement under which a person is responsible for both services that would otherwise be subject to tax as a service under RCW 82.04.290(2) and also constructing, building, repairing, improving, or decorating activities that would otherwise be subject to tax under another section of this chapter is subject to the tax that applies to the <u>predominant activity</u> under the contract or agreement.

RCW 82.04.051(2) (emphasis added).

And finally, RCW 82.04.051(3) addresses the situation where a party enters into successive contracts where the person is responsible for a services tax under RCW 82.04.290 for the first contract, and the construction tax under RCW 82.04.250 for the subsequent contract. In that situation, the focus is on whether the subsequent contract was anticipated:

> (3) Unless otherwise provided by law, a contract or agreement under which a person is responsible for activities that are subject to tax as a service under RCW 82.04.290(2), and a subsequent contract or

---

[7] As discussed below, this subsection of the statute was amended in 2020—after the relevant tax periods.

> agreement under which the same person is responsible for constructing, building, repairing, improving, or decorating activities subject to tax under another section of this chapter, shall not be combined and taxed as a single activity <u>if at the time of the first contract or agreement it was not contemplated by the parties, as evidenced by the facts, that the same person would be awarded both contracts.</u>

(Emphasis added.)

Under this statutory framework, the primary questions before us are first, under RCW 82.04.051(2), whether at the time of entering the model agreement or Development Agreement, the parties anticipated that West Coast would be awarded both the Development Agreements and CMAs? If so, then we review the Development Agreements and CMAs as a single event. Second, was West Coast responsible under the CMAs for "services rendered in respect to" construction as defined by RCW 82.04.051? This second step requires that we determine (a) were the services "directly related" to construction; (b) was West Coast "responsible for the performance of" the construction; and (c) was the construction activity the predominant activity under agreements?

### III

At the outset, West Coast argues that a 2020 amendment to RCW 82.04.051(1), excluding "land development or management services" from retail sales, should apply retroactively. We disagree.[8]

---

[8] Because we conclude that the Development Agreements and CMAs should be viewed as a single taxing event, and that the predominant activity was construction, it may be irrelevant whether the 2020 amendment affects the outcome because services performed under the CMAs predominated over those in the Development Agreements. We include this analysis to address West Coast's assignment of error.

In 2020, five years after the audit period in question, the legislature amended RCW 82.04.051(1) and expanded the definition of "services rendered in respect to" as used in RCW 82.04.050 to exclude "land development or management" services. RCW 82.04.051(1) now states that "services rendered in respect to" means

> in the context of constructing, building, repairing, improving, and decorating buildings or other structures, those services that are directly related to the constructing, building, repairing, improving, and decorating of buildings or other structures and that are performed by a person who is responsible for the performance of the constructing, building, repairing, improving, or decorating activity. The term does not include services such as engineering, architectural, surveying, flagging, accounting, legal, consulting, land development or management, or administrative services provided to the consumer of, or person responsible for performing, the constructing, building, repairing, improving, or decorating services.

(Emphasis added.) The legislature then defined "land development or management as:

> site identification, zoning, permitting, and other preconstruction regulatory services provided to the consumer of the constructing, building, repairing, improving, or decorating services. This includes, but is not limited to, acting as an owner's representative during any design or construction period, including recommending a contractor, monitoring the budget and schedule, approving invoices, and interacting on the behalf of the consumer with the person who has control over the work itself or responsible for the performance of the work.

RCW 82.04.051(4)(a).

"Courts generally presume that statutes act prospectively absent contrary legislative intention." Wash. Waste Sys., Inc. v. Clark County, 115 Wn.2d 74, 78, 794 P.2d 508 (1990). "But curative statutes, i.e., statutes which clarify ambiguities in older legislation without changing prior case law, presumably act retroactively." Washington Waste Sys., 115 Wn.2d at 78. For example, in McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs. of State of Wash., 142 Wn.2d 316, 325, 12 P.3d 144 (2000), our Supreme Court held that certain amendments to the APA were retroactive. In that case,

the amendment at issue expressly intended to clarify an ambiguity in the statute created by a recent superior court decision. McGee, 142 Wn.2d at 324. The court explained that the amendment was curative because it clarified the ambiguity. McGee, 142 Wn.2d at 325-26.

When RCW 82.04.051 was first enacted in 1999, the legislature explained its intent to clarify services in light of changing business practices and then recent court decisions confusing the issue. But the legislative history of the 2020 amendment does not include the intent to clarify or correct an ambiguity in the statute and there is no mention of ambiguity created by a recent controversy. The legislature amended its intent statement only to "[r]ecognize the need to remove barriers to the creation of affordable housing." LAWS OF 2020, ch. 109, § 1. The 2020 amendment was not curative but reduced the scope of services subject to retail sales tax by excluding land development or management services as applied to construction in an effort to remove barriers for affordable housing. S.B. Rep. on H.B. 2229, at 2, 66th Leg., Reg. Sess. (Wash. 2020).

For these reasons, we conclude that the 2020 amendment is not curative and does not apply retroactively to West Coast's activities.

IV

West Coast argues that the Board erred in concluding that it was the party responsible for construction, and that the predominant activity under the Development Agreements and CMAs when considered in combination was construction. We disagree.

A

Under the statutory framework discussed above, we first determine whether at the time of entering the Affiliation Agreement and Development Agreements, the parties anticipated that West Coast would be awarded both the Development Agreements and CMAs?  RCW 82.04.051(2).  The Board concluded that the parties met this standard:

> [Finding of Fact 20.]  The Affiliation Agreement, Development Agreements, and Construction Management Agreements explicitly show that, at the time the Affiliation Agreement and subsequently the Development Agreements were executed, the parties not only contemplated but intended that [West Coast] would be awarded the subsequent Construction Management Agreements for each project.

> [Conclusion of Law 14.]  The terms of the Affiliation Agreement, Development Agreements, and Construction Management Agreements clearly show that, at the time the Development Agreements were executed, the parties to the agreements contemplated that [West Coast] would be awarded both the Development Agreements and Construction Management Agreements.

West Coast does not assign error to the Board's conclusion.  West Coast provides no argument that the Board erred by combining the agreements and seems to concede that any error in reading the agreements together was harmless.[9]  We agree with the Board.[10]  Accordingly, we view the services provided under the Development Agreements together with the CMAs as a single taxing event.

B

We next address whether West Coast was responsible for "services rendered in respect to" construction.  RCW 82.04.051.  This requires we determine (a) were the

---

[9] Other than citing to language in the Department's administrative determination, West Coast does not argue differently.

[10] As discussed above, the Affiliation Agreement included a model Development Agreement and a model CMA.  The executed Development Agreements were consistent with the model agreement and also incorporated a model CMA.  The executed CMAs were nearly identical to the model agreements.

services "directly related" to construction; (b) was West Coast "responsible for the performance of" the construction; and (c) was the construction activity the predominant activity under agreements?  RCW 82.04.051(1), (2), (4).

1

RCW 82.04.051 does not define the phrase "directly related."  If "the statute defines a term, we must rely on that provided definition."  Cave Props. v. City of Bainbridge Island, 199 Wn. App. 651, 656, 401 P.3d 327 (2017).  Undefined words in statutes must be given their plain and ordinary meaning and interpreted in the context of the statute.  Ekelmann v. City of Poulsbo, 22 Wn. App. 2d 798, 807, 513 P.3d 840 (2022).  We may refer to dictionary definitions to determine that plain meaning.  Clark County v. Portland Vancouver Junction R.R., LLC, 17 Wn. App. 2d 289, 295, 485 P.3d 985 (2021).  The dictionary defines the word "directly" as meaning in a "direct manner" or "directly relevant" and the word "relate" as including to "to show or establish logical or causal connection between."  MERRIAM-WEBSTER ONLINE DICTIONARY, https://www. merriam-webster.com/dictionary/directly; https://www.merriam-webster.com/dictionary/ relate (last visited Aug. 13, 2025).  Accordingly, only activities that are relevant and logically connected to construction qualify as directly related to construction.

There can be little dispute that all five of the CMAs at issue are directly related to construction.  Indeed, the opening recitals of all five CMAs include language similar to:

A. The Owner has approved the construction of a self-storage facility on the real property referred to as . . .

B. Construction Manager[11] is engaged in the business of providing contract management, budgeting, bid management, contractor

---

[11] The West Seattle CMA substitutes "Owner's Representative" for Construction Manager.

evaluation and selection construction supervision, oversight and consulting services on behalf of property owners in connection with the construction of self-storage facilities.

The CMAs directly relate to construction. West Coast does not argue to the contrary.

2

Again, RCW 82.04.051(4)(b) defines "responsible for the performance" to mean

that the person is obligated to perform the activities, either personally or through a third party. A person who reviews work for a consumer, retailer, or wholesaler but does not supervise or direct the work is not responsible for the performance of the work.

Washington follows the objective manifestation theory of contracts. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Under this theory, we determine the parties' intent from the reasonable meaning of the words used rather than the unexpressed subjective intent of parties. Hearst Commc'ns, 154 Wn.2d at 503. Words are given their "ordinary, usual, and popular meaning unless a contrary intent is shown from the entirety of the agreement." Condon v. Condon, 177 Wn.2d 150, 163, 298 P.3d 86 (2013). We do not interpret what was intended to be written but what was written. Hearst Commc'ns., 154 Wn.2d at 504.

The CMAs for Padden Parkway, East Vancouver, Columbia City, and Sheridan Beach all required West Coast to "use its best efforts to cause the construction of improvements to proceed and be completed in accordance with or in advance of the Schedule." This included (a) holding preconstruction and progress meetings with the general contractor; (b) coordinating the work of and act as a liaison with the general contractor and planning team; (c) requiring the general contractor to maintain sufficient personnel at the construction site; (d) use its best efforts to guard against defects and

deficiencies and reject any work that does not meet quality control; e) oversee all aspects of construction and require compliance by all consultants and contractors; (f) supervise the preparation and implementation of a construction flow chart to ensure timely completion of construction and to coordinate the delivery of goods, materials, and services; (g) make recommendations to Catalyst regarding any liens or encumbrances; and (h) upon completion of the improvements for a portion of the property, oversee the maintenance of such improvements until all improvements are complete.

These CMAs also require, as part of the construction services, that West Coast:

cause construction of the improvements to proceed so that the improvements are substantially completed and then finally completed (i) within the Development Budget, (ii) in a good and workmanlike manner in accordance with the plans and specifications and all legal requirements, and (iii) in accordance with the schedule. Construction Manager shall not permit the construction of the improvements to be abandoned or permanently discontinued.

We agree with the Board, that these requirements make clear that West Coast was responsible for performance of the construction. While West Coast did not itself perform the construction, it was responsible to ensure a third party did. And while West Coast was reviewing work for Catalyst, it was both supervising and directing the work. RCW 82.04.051(4)(b).

The West Seattle CMA differs from the other CMAs in how it describes West Coast's services. In the opening recitals, the CMA states that "Owner acknowledges and agrees that Owner's Representative is not a licensed contractor, it will act only in the capacity as an adviser to and representative of Owner, and nothing in this Agreement makes Owner's Representative responsible for the actual performance of the construction of the Project." While this supports West Coast's argument that it was

not responsible for the actual performance of the construction, the definition of responsible for performance includes not just actual performance, but performance "personally or through a third party." RCW 82.04.051(4)(b).

West Coast is correct that the language in paragraphs 3.1, 3.2, and 3.7 of the West Seattle CMA differs by spelling out that West Coast is acting more in an advisory role. But again, RCW 82.04.051(4)(b) states that "[a] person who reviews work for a consumer, retailer, or wholesaler but does not supervise or direct the work is not responsible for the performance of the work." (Emphasis added.) Therefore, a person that reviews work for a consumer, retailer, or wholesaler and does supervise or direct the work, is the person responsible for the performance of the work. Even under the revised language in the West Seattle CMA, West Coast is "supervising" and "directing" the construction.

For example, section 3 of the West Coast CMA spells out the "Construction Oversight and Advisory Services to be Performed by [West Coast]." (Emphasis added.) Then paragraph 3.1 states that the owner is engaging and authorizing West Coast to "provide the oversight and advisory services" described in sections 3, 4, and 5. While the term "supervising" is not defined in RCW 82.04.051, the dictionary definition of "supervise" is "to be in charge of: superintend, oversee." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/supervise (last visited Aug. 13, 2025). Thus, under a plain reading of the CMA, West Coast was hired to supervise the construction and meets the definition of "responsible for the performance."

Similarly, paragraph 3.2 requires West Coast to "monitor" on behalf of the owner, make progress reports to the owner, and "make necessary recommendations to cause

the General Contractor's construction of the improvements to proceed and be completed in accordance with or in advance of the Schedule." (Emphasis added.) And in paragraph 3.7, West Coast:

> shall provide status report to the Owner and make recommendations <u>to cause</u> the General Contractor's construction of the improvements to proceed so that the improvements are substantially completed and then finally completed (i) within the Development Budget, (ii) in a good and workmanlike manner in accordance with the Plans and Specifications and all legal requirements, and (iii) in accordance with 'the Schedule. <u>Construction Manager shall not permit the construction of the improvements to be abandoned or permanently discontinued by the General Contractor.</u> Construction Manager shall promptly give notice to the Owner of the completion of the improvements.

(Emphasis added.)

The plain words of the contract make clear, that despite the change in language from previous CMAs, West Coast was still required to both supervise and direct the construction work for the West Seattle project and is therefore responsible for the performance of the work under RCW 82.04.051(4)(b).

3

Finally, under RCW 82.04.051(2), where there is an activity and a person that is responsible for both non-retail service and construction activities taxable under chapter 82.04 RCW, the activity is subject to the tax that applies to the predominant activity. We agree with the Board that the predominant activity contemplated between the Development Agreements and CMAs is construction. West Coast entered into the Development Agreements to develop properties for construction of self-storage

facilities.[12] West Coast's compensation under the Development Agreements was to be paid upon the receipt of a building permit and final construction approval. West Coast then entered into the CMAs in order to manage construction of the self-storage facilities on the properties developed under the Development Agreements. Thus, the predominant purpose of both the Development Agreements and CMAs was the construction of self-storage facilities.

As a result, we agree with the Board that West Coast was responsible for "services rendered in respect to" construction. RCW 82.04.051. We affirm the assessment.

_Mann, J._

WE CONCUR:

_Chung, J._          _Coburn, J._

---

[12] For example, section 1 of the Padden Parkway Development Agreement sets out the development services that West Coast is to provide. These include site identification, site evaluation, purchase and sale agreement, entitlements and design, obtaining a building permit for construction, preparation of the construction contract, and presentation for final construction approval.